TERRY L. THEYE AND ABNER W. ELZEY *v.* WILLIAM C. BATES, WALTER T. BATES AND EVA I. GARDNER.

[No. 2-774A173. Filed November 24, 1975. Rehearing denied February 13, 1976.]

*David Peebles,* of Fort Wayne, *Robert W. McNevin,* of Indianapolis, for appellants.

*Charles W. Symmes,* of Indianapolis, *D. Robert Webster,* of Indianapolis, for appellees.

## CASE SUMMARY

BUCHANAN, J. — Plaintiff-Appellants, Terry L. Theye (Theye) and Abner W. Elzey (Elzey), (collectively, Appellants), appeal from a trial court judgment denying them return of their investment in Development Corporation of America (DCA), claiming Defendant-Appellees, William: C. (Bill) Bates and Walter T. Bates (collectively, Appellees), committed two violations of the Indiana Securities Law (Securities Act) [IC 1971, 23-2-1-1 *et seq.*] : (1) failure to register the securities of DCA; and (2) fraud.

We affirm.

## FACTS

The evidence and facts most favorable to the trial court's judgment are:

Prior to September, 1966, an attempt to franchise the Spaghetti Bowl Restaurant (Spaghetti Bowl) of Fort Wayne, Indiana, as a fast-food franchise was undertaken by Paul Alles (Alles), an employee of Spaghetti Bowl. Unsuccessful, Alles contacted Bill Bates to undertake the franchising of Spaghetti Bowl.

After several months of negotiations between Bill Bates and the owners of Spaghetti Bowl, Ted Schleich (Schleich) and Elmer Lambright (Lambright), it was determined "that Development Corporation of America [DCA] would be formed for the purpose of launching this franchising operation." It was characterized as a "Turnkey Operation", i.e., nine "satellite" corporations, operating independently and fulfilling specialized purposes, would combine their efforts through the

coordinated effort and control of Development Corporation of America (DCA), the "nucleus" corporation.

DCA's "Real Estate Mortgages" booklet described the "Turnkey Operation" this way:

> The franchisor will provide the franchisee with: (1) location, (2) building, (3) equipment, (4) product, (5) supplies, (6) program, and (7) training period. These items are packaged at a fixed cost, sold in the form of a franchise and the purchaser is in business. Each of these functions individually is of no great obstacle; however, combined they represent a considerable task for the franchisor to tackle alone—this is usually the case. Thus, the need for an organization, such as DCA, has become apparent both to ourselves and the food franchise industry. DCA forms the nucleus for a group of 9 satellite corporations and combines their individual purposes for one goal—to build the nation's largest, and most successful food franchise by 1970.
>
> . . .
>
> To insure the proper co-ordination, effectiveness, and singleness of purpose to all the DCA satellite corporations, W. C. (Bill) Bates serves as Chairman of the Board and Chief Executive officer with each of the nine corporations.

Alles was also instrumental in introducing Bill Bates to both Elzey and Theye.

Bill Bates first became acquainted with Elzey sometime in August, 1966, after Elzey had already purchased two Spaghetti Bowl franchises from Alles. At that time, Bates and Elzey discussed the opportunity afforded Elzey to contribute his experience and knowledge of real estate to the proposed venture.

In September, 1966, Terry Theye's father was approached for the ownership of a Spaghetti Bowl franchise; but in later conversations he suggested that his son Terry (who had a Business Administration Degree from International College in Fort Wayne) should both invest in and be employed by DCA.

Before meeting Elzey and Theye, Bill Bates had obtained

financial information from the owners of Spaghetti Bowl which he accepted and believed to be "true and correct", the substance of this information was that Spaghetti Bowl grossed $10,000-$15,000 monthly. Bill Bates passed these figures on to Theye prior to his investment into DCA and Theye was aware that they originated from the Spaghetti Bowl owners. After DCA was incorporated, Spaghetti Bowl grossed no more than Eight Thousand Dollars ($8,000.00) monthly, and averaged Five Thousand Dollars ($5,000.00) gross income per month.

Prior to establishing DCA, the owners of Spaghetti Bowl (Schleich and Lambright), Elzey, Theye, Bill Bates, and Bill Patton (President of one of the "satellite" corporations, Marketing Corporation of America), agreed that Twenty Thousand Dollars ($20,000) in cash should be the starting capital basis of DCA. It was also understood by Elzey and Theye that each would contribute one-half of this Twenty Thousand Dollars ($20,000.00) in return for Two Thousand Five Hundred (2,500) shares each of DCA's total Fifty Thousand (50,-000) shares of authorized stock. This understanding was subsequently incorporated into a written "Subscription Agreement" on September 26, 1966:

## SUBSCRIPTION AGREEMENT

WHEREAS, it is proposed by certain interested parties to organize a corporation to be known as DEVELOPMENT CORPORATION OF AMERICA, with its principal office and place of business at 836 East 64th Street, Indianapolis, Indiana, and having a capital structure of fifty thousand (50,000) shares of common capital stock of no par value;

NOW, THEREFORE, the undersigned, subscribers hereto, in consideration of the mutual agreements herein contained, hereby agree each for himself and with each other, and with the corporations hereinafter named, to take and pay for the number of shares set opposite our respective names, the consideration in payment for said shares and options to purchase said shares, as herein stated, to be that set forth opposite our names and shares to be taken.

DATED this 26th day of September, 1966.

| Name and Address | Number of Shares | Consideration | Options | Consideration to Exercise Option |
|---|---|---|---|---|
| /s/ Abner W. Elzey<br>Abner W. Elzey<br>210 Ogdon Street<br>Ossian, Indiana | 2,500 | $10,000.00 | One Year option to purchase 2,500 shares | $10,000.00 |
| /s/ Terry L. Theye<br>Terry Lee Theye<br>5024 Forest Grove<br>Fort Wayne, Indiana | 2,500 | $10,000.00 | One Year option to purchase 2,500 shares | $10,000.00 |
| /s/ W. C. Bates<br>W. C. Bates<br>6025 Meadowlark Drive<br>Indianapolis, Indiana | 5,000 | Promotional Services | None | |
| /s/ Paul M. Alles<br>Paul M. Alles<br>415 Edgeknoll<br>Fort Wayne, Indiana | 1,250 | Promotional Services | None | |
| Spaghetti Bowl Systems, Inc.<br>3509 N. Clinton St.<br>Fort Wayne, Indiana | 5,000 | Five Percent (5%) of Authorized Capital Stock of Marketing Corporation of America. | None | One Yr.-$40,000.00 Option to purchase 10,000 Shares |
| Marketing Corporation of America<br>836 East 64th St.<br>Indianapolis, Indiana | 10,000 | Five Percent (5%) of Authorized Capital Stock of Marketing Corporation of America.; Twenty Percent (20%) of Authorized Capital Stock of Spaghetti Bowl Systems, Inc.; Ten Percent (10%) of Authorized Capital Stock of United Printing Corporation; Ten Percent (10%) of Authorized Capital Stock of United Advertising & Publishing Corporation; Ten Percent (10%) Authorized Capital Stock of International Accounting Systems, Incorporated; and, National Management Contract for Spaghetti Bowl Systems, Inc. | | |

By: /s/ Theodore A. Schlarch
President

By: /s/ William H. Patton
President

The next day, September 27, 1966, Elzey, Theye, Alles, Schleich, Patton, Bill Bates, and his brother, Walter Bates, incorporated DCA, and the Secretary of State of Indiana approved DCA's incorporation.

Among those serving both as directors and officers of DCA were Theye (Vice President), Elzey (Vice-President), Bill Bates (Chief Executive Officer) and Walter Bates (President), all parties to this appeal.[1]

Both Elzey and Terry Theye were subsequently employed by DCA. They earned approximately Ten Thousand Dollars ($10,000) per year for being "in charge of equipment purchasing, maintenance, and management, public relations and commissary management." In return for his contributions and experience "in the area of real estate acquisition, leasing and development," Elzey earned Ten Thousand Two Hundred ($10,200.00) per year plus stock options. The only other paid employee was Walter Bates, and his salary was not disclosed at trial.

From our examination of the transcript, including the Subscription Agreement and the annual corporate report filed with the Secretary of State in 1967, we find that there was Twenty-Six Thousand Two Hundred Fifty (26,250) shares issued to six (6) shareholders in return for various promotional services valued at Ten Thousand Dollars ($10,000.00), Twenty Thousand Dollars ($20,000.00) cash, and other corporate stocks valued at Thirty-Three Thousand Three Hundred Thirty-Three 33/100 Dollars ($33,333.33).

At no time did DCA prepare a prospectus or register any of its corporate stock with the Indiana Secretary of State's Office, Securities Division.

Both Theye and Elzey allege Bill Bates represented to them prior to the execution of the Subscription Agreement that a

---

1. The Appellants note in their brief that Eva I. Gardner, Secretary of DCA, was not served with process and consequently she is not a party to this appeal.

minimum of One Hundred Thousand Dollars to One Hundred Fifty Thousand Dollars ($100,000 to $150,000) would be invested in DCA. Bates emphatically denied any such representation but did admit that, in an executive meeting after the incorporation of DCA, Elzey recommended that DCA have One Hundred Fifty Thousand Dollars ($150,000) in order "to carry out the project". Bates response[2] to Elzey at that meeting was:

[T]hat in my opinion it did not require capitalization of a Hundred Thousand Dollars ($100,000) for what we were accomplishing, because we did have our system established so that our overhead was very low. We had very few people on our payrolls, the two, three people, including my brother, Terry Theye, and Elzey, created the biggest liability, as far as our overhead operation was concerned. When we sold a franchise we received Five Thousand Dollars ($5,000.00) for the franchise, which, basically, was clear money to utilize for whatever expenses the operation would require. After the franchise was sold, the franchisee was obligated to purchase about Seventeen (17) to Twenty-Two Thousand Dollars ($22,000.00), in equipment, of which there was very substantial profit for us in this regard. . . . So, in my opinion, I think it was proven the fact that we were in business for over a year, the initial Twenty Thousand Dollars ($20,000) was very sufficient to sustain operation to the point to where it can create its own cash flow from its own operations and from its own income. And it, in fact, did that and did, in fact, sustain itself for this year's period of time. . . .

DCA was subsequently placed in receivership, then bankruptcy, and the Appellants (Theye and Elzey) filed their complaint in the Marion County Superior Court on September 24, 1968, seeking recovery for money they paid for DCA's stock due to Appellants' violations of the Securities Act and for six percent (6%) interest and attorneys' fees as allowed by IC 1971, 23-2-1-19. The trial court entered judgment against the Appellants and for the Appellees.

---

2. Bill Bates' testimony about the financing of DCA was later corroborated by the testimony of Patton.

## ISSUES

As we decipher the Motion to Correct Errors, only two issues are presented:

ISSUE ONE  Did the Appellees (Defendants) violate the Indiana Securities Act by not registering the securities of DCA?

ISSUE TWO  Did the Appellees (Defendants) commit fraud under the Indiana Securities Act?

AS TO ISSUE ONE, the Appellants (Theye & Elzey) contend that the Appellees offered or sold securities of DCA to Appellants without registering said securities as required by the Securities Act, in violation of IC 1971, 23-2-1-3, making it unlawful to sell securities unless registered.

The Appellees reply that the offer or sale of DCA's securities was exempt from registration under the Securities Act.

AS TO ISSUE TWO, the Appellants assert that the Appellees sold securities to the Appellants based upon financial information which later proved to be false, thereby constituting fraud under the Securities Act, in violation of IC 1971, 23-2-1-1(d), -12 (Burns Code Ed.).

The Appellees answer that the trial court was correct in finding that no fraud was committed.

## DECISION

### ISSUE ONE

CONCLUSION—It is our opinion that there was no exemption from registering DCA's securities; however, we conclude that the Appellants cannot raise the Appellees' failure to register DCA's securities because the Appellants are *equally culpable* [*in pari delicto*] with the Appellees in violating the Securities Act by not registering such securities as required by IC 1971, 23-2-1-3 (Burns Code Ed.).

We first address ourselves to the question of exemption of the DCA securities from registration, which admittedly were not registered.

The position of Appellees, is that the securities were exempt from registration by virtue of IC 1971, 23-2-1-2(b) (10) :[3]

(b) The following transactions are *exempted* from section 201 [23-2-1-2] :

(10) any offer or sale of a security if, during any period of twelve [12] consecutive months which includes the date of such offer or sale, the offeror or seller has not directed offers to sell securities of the same class to more than twenty [20] persons in this state, excluding in determining the number of such persons, persons receiving offers otherwise exempted by this section 102 and also excluding persons receiving offers of such securities made after registration thereof under this act, whether or not the offeror, seller, or any of the offerees or buyers are then present in this state *and if (A) each buyer in a sale exempted under this subsection represents in writing to the seller that he is purchasing such securities for investment,* and (B) no commission or other remuneration is paid or given for or on account of a sale exempted under this subsection (10) ; but the commissioner may by rule or order, as to any security or transaction or any type of security or transaction, [withdraw or] further condition this exemption, or increase

3. IC 1971, 23-2-1-2(b) (10) was amended by Acts 1975, P.L. 261, § 2, pp. 1413-14, to allow an exemption under the following circumstances:

(10) the offer or sale of any security by the issuer thereof if all of the following conditions are satisfied:

(i) there shall be no more than thirty-five [35] purchasers of the securities in any offering pursuant to this subsection, excluding in determining the number of purchasers, persons purchasing securities in a transaction exempted by any provision of section 2 of this chapter or persons purchasing securities after registration under this chapter;

(ii) the issuer does not offer or sell the securities by means of any form of general advertisement or general solicitation;

(iii) each purchaser of the securities gives a written representation that he is acquiring the securities for his own investment; and

(iv) if any commission or other remuneration is paid or given for soliciting any prospective buyer or selling any securities in any offering pursuant to this subsection, then each offeree shall be furnished with an offering statement which shall set forth all material facts with respect to such security, and the commissioner shall be notified in writing of the terms of the offer and if he does not disallow the exemption within the next five [5] full business days;

or decrease the number of offerees permitted, or waive the conditions in clauses (A) and (B) with or without the substitution of a limitation on remuneration; (Our emphasis.)

(hereafter, the (b) (10) exemption).

In order to establish the exemption, the burden was on appellees, as the party claiming the benefit of the exemption, to prove the securities were exempt from the registration requirements[4] of IC 1971, 23-2-1-3.

"(j) It will not be necessary to negative any of the exemptions or classifications in this act provided in any complaint, information, indictment or any other writ or proceedings laid or brought under this act and *the burden of proof of any such exemption or classification shall be upon the party claiming the benefits of such exemption* or classification." (Our emphasis.) IC 1971, 23-2-1-16 (j) ; *Hippensteel* v. *Karol* (1973), 159 Ind. App. 146, 150, 304 N.E.2d 796, 798.

A (b) (10) exemption arises when:

[I]. (A) there is an offer or sale,

(B) of a security,

(C) directed to no more than twenty (20) persons in this state,

(D) within any twelve (12) month period of time, (excluding in determining the (20) persons: (1) those persons receiving offers otherwise exempted by this section [IC 1971, 23-2-1-2 (Burns Code Ed.)], and (2) those persons receiving offers of securities after a proper registration has been obtained under this act—and within these two excluded classes it makes no difference whether any of the offerors, sellers, offerees or buyers are then present in this state) ; and,

[II]. (A) *each buyer in a sale, exempted under this subsection, represents in writing to the seller that he is purchasing such securities for investment,* and

---

4. IC 1971, 23-2-1-3 provides:
It is unlawful for any person to offer or sell any security in this state unless (1) it is registered under this act [23-2-1-2—23-2-1-25] or (2) the security or transaction is exempted under Section 102 [23-2-1-2]. [Acts 1961, ch. 333, § 201, p. 984].

(B) no commission (or other remuneration) is paid because of the sale exempted under this subsection. *See, Hippensteel* v. *Karol* (1973), 159 Ind. App. 146, 304 N.E.2d 796; 8 IND. L. REV. 29, 29-32 (1974); 48 IND. L. J. 216, 221-222 (1973); 38 IND. L. J. 38, 54 (1962). *Doxsee, Securities Problems in Indiana,* Res Gestae, September, 1973, at 9.

The record contains no evidence whatsoever as to the statutory requirement that each buyer has represented in writing to the seller that "he is purchasing such securities for investment".[5] Therefore, Appellees did not carry their burden of proof of a (b) (10) exemption.

At this juncture, the complaint of Appellants for return of their investment could not be defeated by the existence of an exemption to the transactions by which they purchased their stock. But it could be defeated if they, the Appellants, were in violation of the Indiana Securities Law, i.e., they cooperated with the Appellees in violating the law. Appellees claim the judgment can be supported on the basis that the Appellants did participate with the Appellees in failing to register the securities, and therefore were *in pari delicto.*[6]

The doctrine known by the latin phrase *in pari delicto* literally means "of equal fault". *Perma Life Mufflers, Inc.*

5. In the September, 1973, issue of Res Gestae, Donald Doxsee, former Chief Deputy Securities Commissioner from 1964-67 suggested in his article, *Securities Problems in Indiana,* that,

"The requirement that the buyer represent in writing that he is purchasing for investment can be met by including a statement to that effect in the subscription agreement or by requiring the purchaser to sign a separate investment letter." Res Gestae, September, 1973, at 9.

6. Appellants' claim that the *in pari delicto* defense was an affirmative defense under TR. 8(C), . . . and, because it was not raised by Appellees in a responsive pleading [TR. 8(C)] it therefore is waived. However, this question is not available as Appellants at trial failed to object to *in pari delicto* evidence, (which provided a reasonable basis for the trial court's judgment), because such evidence was "not within the issues made by the pleadings . . .". TR. 15(B).

*See, Ayr-Way Stores, Inc.* v. *Chitwood* (1973), 261 Ind. 86, 90-91, 300 N.E.2d 335, 338.

v. *Intern. Parts Corp.*, 392 U.S. 134, 135 (1968). Justice Harlan, in a dissenting opinion in *Perma Life Mufflers, supra,* characterized the doctrine this way:

> Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant. *Perma Life Mufflers, Inc., supra,* at 153. *See, Am. Mutual Life Ins. Co.* v. *Bertram* (1904), 163 Ind. 51, 70 N.E. 258; *Young* v. *Kwock,* 52 Hawaii 273, 474 P.2d 285 (1970); *Miller* v. *Calif. Roofing,* 55 Cal. App.2d 136, 130 P.2d 740 (1942); *Western Oil & Refining Co.* v. *Venago Oil Corp.*, 218 Cal. 733, 24 P.2d 971 (1933); W. FLETCHER, PRIVATE CORPORATIONS § 6764 (perm. ed. repl. ed. 1975); 79 C.J.S. SUPP., Securities Regulation § 234; Annot., 94 A.L.R.2D 479 (1962).

The annotation in 84 A.L.R.2d 479, 491, agrees with Justice Harlan:

> The expression "in pari delicto" is a portion of the longer Latin sentence, "In pari delicto potior est conditio defendentis," which means that where the wrong of both parties is equal, the position of the defendant is the stronger. This maxim, applicable, to the law of contracts, signifies that neither a court of equity nor one of law will provide a remedy when such a situation is presented.

More specifically, the annotation, discusses the doctrine of *in pari delicto* as to the issuing or selling of corporate stock:

> Where a purchaser of stock participates in the organization or management of the corporation issuing or selling the stock, he may be considered as in pari delicto with the seller, precluding him from asserting the invalidity of the contract on the ground that it violates state securities regulations. Annot., 84 A.L.R.2D 479, 498 (1962).

Absent specific Indiana[7] law on this subject we are inclined to follow the rule stated in Annot., 84 A.L.R.2D 479 (1962).

---

7. The doctrine of *in pari delicto* in the issuance of illegal insurance contracts was discussed in one case, the court saying "[the insured cannot] recover the premiums paid, if the parties are *in pari delicto*." *Am. Mutual Life Ins. Co.* v. *Bertram* (1904), 163 Ind. 51, 60-63, 70 N.E. 258.

There was ample evidence to support the trial court's judgment denying Appellants' recovery because they participated in the organization and management of the corporation and were therefore also at fault for failing to register the DCA securities . . . a circumstance which precludes them from asserting the invalidity of their stock acquisition.

Both Elzey and Theye volunteered their services and desired to join and invest in DCA. Both Elzey and Theye, with others, were instrumental in incorporating DCA and signed its Articles of Incorporation as incorporators. Subsequently, they both served as active directors and officers of DCA.

> From these circumstances the trial court could have reasonably found that the Appellants were equally at fault with Appellees in failing to register the securities.

ISSUE TWO

CONCLUSION—It is our opinion that the Appellants have failed to demonstrate that the trial court's decision is contrary to law.

The Appellants contend, as appellants often do, that the evidence supports their position. They maintain the Appellees, particularly Bill Bates, committed fraud and deceit as defined in IC 1971, 23-2-1-1 (d) (Burns Code Ed.) and as prohibited in 23-2-1-12 (Burns Code Ed.). These statutes read as follows:

> (d) The terms "fraud," "fraudulent," "deceit," and "defraud" shall include and refer to any misrepresentation in any manner of a material fact, which misrepresentation is intentional or due to gross negligence, any promise or representation or prediction as to the future not made honestly or in good faith or the intentional failure to disclose a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; Provided, however, That nothing herein contained shall limit or diminish the full meaning of said terms as applied by or defined in courts of law or equity. IC 1971, 23-2-1-1 (d) (Burns Code Ed.)

It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, (1) to employ any device, scheme or artifice to defraud, or (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading, or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. IC 1971, 23-2-1-12 (Burns Code Ed.).

But the trial court found against Appellants on the fraud issue. As they are seeking reversal of a negative judgment, no error is presented as to the insufficiency of the evidence to support the judgment. *Hippensteel* v. *Karol, supra,* 304 N.E.2d at 798; *Engelbrecht* v. *Property Developers, Inc.* (1973), 156 Ind. App. 354, 296 N.E.2d 798; *Smitley* v. *Egley* (1973), 156 Ind. App. 10, 294 N.E.2d 640; *Hiatt* v. *Yergin* (1972), 152 Ind. App. 497, 284 N.E.2d 834.

If the evidence "is without conflict and leads to only one conclusion and the Trial Court reached a contrary conclusion," then we may reverse the judgment as being contrary to law. *Senst* v. *Bradley* (1971), 150 Ind. App. 113, at 116, 275 N.E.2d 573, at 576; *Celanese Coating Co.* v. *Blakemore* (1975), 163 Ind. App. 433, 324 N.E.2d 268; *Heminger* v. *Police Com'm. of City of Fort Wayne* (1974), 161 Ind. App. 72, 314 N.E.2d 827; *Columbia Realty Corp.* v. *Harrelson* (1973), 155 Ind. App. 604, 293 N.E.2d 804.

No such state of affairs exists here. There was some evidence from which an implication of fraud could have been drawn (e.g., Bill Bates alleged representation as to the gross income of Spaghetti Bowl) and there was conflicting evidence as to the existence of fraud, but we can not conclude that reasonable men would have inescapably reached a different conclusion than the one reached by the trial court.

It is well established that a judgment of the trial court

will be affirmed if sustainable on any legal basis, [*Sheraton Corp. of Am.* v. *Kingsford Packing Co., Inc.* (1974), 162 Ind. App. 470, 319 N.E.2d 852; *In re Estate of Barnett* (1974), 159 Ind. App. 491, 307 N.E.2d 490; *Hunter* v. *Milhous* (1973), 159 Ind. App. 105, 305 N.E.2d 448; *Saloom* v. *Holder* (1974), Ind. App., 304 N.E.2d 217.] and the judgment before us is sustainable for the reasons given.

No reversible error having been shown, the judgment of the trial court is hereby affirmed.

Affirmed.

Sullivan, P.J. and Robertson, C.J. (by designation), concur.

NOTE.—Reported at 337 N.E. 2d 837.