FILED

Feb 01 2018, 7:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Robert E. Duff
Fishers, Indiana

ATTORNEYS FOR APPELLEES

Donn H. Wray
Stoll Keenon Ogden PLLC
Indianapolis, Indiana

*Amicus Curiae* Automobile Dealers
Association of Indiana, Inc.

Ronald C. Smith
Jeffrey B. Halbert
Joel T. Nagle
Bose McKinney & Evans, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Adam Boots,

*Appellant-Plaintiff,*

v.

D. Young Chevrolet, LLC d/b/a
Penske Chevrolet, and Capital
One Auto Finance, Inc.,

*Appellees-Defendants.*

February 1, 2018

Court of Appeals Case No.
29A04-1708-PL-1948

Appeal from the Hamilton
Superior Court

The Honorable William J. Hughes,
Judge

Trial Court Cause No.
29D03-1609-PL-8347

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Plaintiff, Adam Boots (Boots), appeals the trial court's summary judgment in favor of Appellees-Defendants, D. Young Chevrolet, LLC d/b/a Penske Chevrolet (Penske Chevrolet), and Capital One Auto Finance, Inc. (Capital One), on Boots' fraud claim and claim under the Indiana Buyback Vehicle Disclosure Law.[1]

We reverse and remand for further proceedings.

# ISSUES

Boots presents us with two issues on appeal, which we restate as:

(1) Whether the trial court erred in granting summary judgment on Boots' claim under the Indiana Buyback Vehicle Disclosure Law, and

(2) Whether the trial court erred in issuing summary judgment on Boots' fraud claim.

# FACTS AND PROCEDURAL HISTORY

In June of 2015, Boots, who lived in Kensington, Maryland, became interested in the purchase of a Chevrolet Corvette. After researching the retail prices of Corvettes advertised online, he became interested in a black 2005 Corvette, advertised for sale online by Penske Chevrolet, an automobile dealership

---

[1] We acknowledge that the Automobile Dealers Association of Indiana appeared as Amicus Curiae in support of Penske Chevrolet and filed its own brief on appeal.

located in Indianapolis, Indiana. Boots contacted Penske Chevrolet by email and communicated with Paul Fiene (Fiene), a salesperson employed by Penske Chevrolet. Over the next several days, Boots and Fiene had extensive email and telephone conversations about the history and condition of the Corvette. They tentatively agreed on a "good price for the year, mileage and options of this Corvette—which is why [Boots] was interested in it—but it was not so low that it signaled to [him] that something was amiss." (Appellant's App. p. 79).

[5] On June 6, 2015, Boots travelled from Maryland to Indiana. When he arrived at Penske Chevrolet, Boots conducted a test drive and inspected the Corvette. The Corvette "did not exhibit any defects" or "significant problems." (Appellant's App. p. 79). Boots agreed to purchase the Corvette and insisted on the price previously negotiated. Fiene reluctantly agreed, "saying in a good-natured way that by insisting on that price [Boots] was taking away all his commission." (Appellant's App. p. 79). The two shook hands and Fiene told Boots that "from one veteran to another[], I will take care of you." (Appellant's App. p. 79). Boots was then escorted into the office of a finance employee to review the purchase paperwork.

[6] While Boots was signing the documents, Fiene entered the office carrying the Corvette's Carfax vehicle history report. Pointing to a particular section on the report, Fiene told Boots that shortly after the vehicle was new, it became a manufacturer buyback. Fiene indicated that even though the car had a "lemon" history, the vehicle had been repaired and everything "was fine now." (Appellant's App. p. 80). Fiene wanted Boots to sign a document related to the

lemon history. Boots stopped signing the paperwork and inquired whether the Corvette "had a rebuilt title." (Appellant's App. p. 80). Boots "believed that the value of the Corvette would not be substantially impaired unless it had a branded certificate of title." (Appellant's App. p. 80). Fiene "responded that it did not and that everything with the certificate of title was fine." (Appellant's App. p. 80). When Boots asked Fiene to put that in writing, Fiene replied that he would have to "ask his boss." (Appellant's App. p. 80).

[7] Shortly thereafter, Fiene returned and gave Boots a 'WE OWE' form, signed by Fiene, which included the statement "[a]s per request we are stating that the State of Indiana did not brand the title to this 2005 Corvette." (Appellant's App. p. 82). With this assurance, Boots agreed to continue with the purchase and signed the remaining paperwork. In August 2016, Boots intended to trade in the Corvette and learned at the dealership in his home state, who had consulted the vehicle's Carfax history, that the Indiana certificate of title had a buyback vehicle brand.

[8] On September 23, 2016, Boots filed a Complaint against Penske Chevrolet and Capital One,[2] alleging common law fraud arising out of the purchase of a motor vehicle, a violation of Indiana's Buyback Vehicle Disclosure Law, and for breach of the implied warranty of title under the Magnuson-Moss Warranty

---

[2] Boots' claim against Capital One is based on liability it contractually assumed as assignee and holder of the Retail Installment Agreement entered into between Penske Chevrolet and Boots. Because Capital One's liability is derivative of Penske Chevrolet's liability, both parties will be assumed as one for purposes of this opinion.

Act.[3] On March 22, 2017, Penske Chevrolet filed a motion for summary judgment on Boots' allegations. On May 24, 2017, Boots responded in opposition to Penske Chevrolet's motion for summary judgment and filed his own motion for partial summary judgment on the liability elements of his claims against Penske Chevrolet. On July 25, 2017, the trial court conducted a hearing on the motions. Thereafter, on August 1, 2017, the trial court summarily granted judgment on Penske Chevrolet's motion and denied Boots' motion for partial summary judgment.

[9] Boots now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

*Standard of Review*

[10] In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. A fact is 'material' for summary judgment purposes if

---

[3] Boots has abandoned his claim pursuant to the Magnuson-Moss Warranty Act on appeal.

it helps to prove or disprove an essential element of the plaintiff's cause of action; a factual issue is 'genuine' if the trier of fact is required to resolve an opposing party's different version of the underlying facts. *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind. 2000). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *First Farmers Bank & Trust Co.*, 891 N.E.2d at 607. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id*. Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id*.

[11] We observe that, in the present case, the trial court did not enter findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer this court valuable insight into the trial court's rationale for its review and facilitate appellate review. *Id*. The fact that parties filed cross-motions for summary judgment does not alter our standard of review. *Ind. Farmers Mut. Ins. Group*, 727 N.E.2d at 15.

## II. *Indiana's Buyback Vehicle Disclosure Law*

[12] As an issue of first impression, Boots relies on the explicit provisions of Indiana's Buyback Vehicle Disclosure Law to contend that the statute applies to any sale of a buyback vehicle, regardless whether it is an initial sale after repurchase by the manufacturer or any resale thereafter. Accordingly, he posits that the trial court erred by limiting the application of the statute to the initial resale of the vehicle only.

[13] To decide this issue, it is necessary to interpret the Buyback Vehicle Disclosure Law, encapsulated in Indiana Code chapter 24-5-13.5. Where, as here, the relevant facts are not in dispute and the interpretation of a statute is at issue, such statutory interpretation presents a pure question of law for which summary judgment disposition is appropriate. *Clem v. Watts*, 27 N.E.3d 789, 791 (Ind. Ct. App. 2015). When construing statutes, our primary goal is to determine and give effect to the intent of the legislature. *Moryl v. Ransone*, 4 N.E.3d 1133, 1137 (Ind. 2014). When a statute is clear and unambiguous, we apply words and phrases in their plain, ordinary and usual sense. *Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015). When a statute is susceptible to more than one interpretation, it is deemed ambiguous and thus open to judicial construction. *Id*. When faced with an ambiguous statute, we examine the statute as a whole, reading its sections together so that no part is rendered meaningless if it can be harmonized with the remainder of the statute. *Id*. We do not presume that the Legislature intended language used in a statute to be applied illogically or bring about an unjust or absurd result. *Id*.

The Buyback Vehicle Disclosure Law is part of Indiana's overarching Motor Vehicle Protection Act, which has as its underlying purpose to give buyers safe and dependable automobiles and to induce manufacturers to improve the quality of their products and service. *See* Harold Greenberg, *The Indiana Motor Vehicle Protection Act of 1988: The Real Thing for Sweetening the Lemon or Merely a Weak Artificial Sweetener*, 22 Ind. L. Rev. 57 (1989). Pursuant to the express terms of the statute, the Indiana Buyback Vehicle Disclosure Law applies to "[a]ll motor vehicles that are sold, leased, transferred, or replaced by a dealer or manufacturer in Indiana." Ind. Code § 24-5-13.5-1. More specifically, a buyback vehicle, also known as a 'lemon,' is defined, in pertinent part, as "a motor vehicle that has been replaced or repurchased by a manufacturer or a nonresident manufacturer's agent or an authorized dealer," and that suffers from nonconformities or defects pursuant to I.C. § 24-5-13-8. I.C. § 24-5-13.5-3. A buyback vehicle may not be resold in Indiana unless the following conditions have been met:

> (1) The manufacturer provides the same express warranty the manufacturer provided to the original purchaser, except that the term of the warranty need only last for twelve thousand (12,000) miles or twelve months after the date of resale.

> (2) The following disclosure language must be conspicuously contained in a contract for the sale or lease of a buyback vehicle to a consumer or contained in a form affixed to the contract:

> "IMPORTANT

> This vehicle was previously sold as new. It was subsequently returned to the manufacturer or authorized dealer in exchange for a replacement vehicle or a refund because it did not conform to the manufacturer's express warranty and the nonconformity was not cured within a reasonable time as provided by Indiana law."
>
> (3) The manufacturer provides the dealer a separate document with a written statement identifying the vehicle conditions that formed the basis for the previous owner's or lessee's dissatisfaction and the steps taken to deal with that dissatisfaction in 10-point all capital type.

I.C. § 24-5-13.5-10. Prior to "reselling a buyback vehicle in Indiana, a dealer must provide the buyer the express warranty required by section 10(1)[4] of this chapter and the written statement of disclosure required by section 10(3) of this chapter and obtain the buyer's acknowledgment of this disclosure at the time of sale or lease as evidenced by the buyer's signature on the statement of disclosure." I.C. § 24-5-13.5-11. Consistent with Indiana law, the face of a certificate of title of a buyback vehicle must be branded with the statement "Manufacturer Buyback – Disclosure on File." I.C. § 9-17-3-3.5.

---

[4] We acknowledge Penske Chevrolet's argument that Boots omitted to raise the issue of the express warranty until his reply brief on summary judgment. However, in his Complaint, Boots generally argued that Penske Chevrolet "violated the Indiana Buyback Vehicle Disclosure Law" and during the proceedings Penske Chevrolet conceded to not having provided Boots with the express warranty. *See, e.g.*, Transcript p. 6 ("And we did fail to provide it.").

[15]     Referencing a statement on the Attorney General's website,[5] Penske Chevrolet, supported by *Amicus*, now attempts to create an ambiguity by interjecting a requirement in the statutory language that the written disclosure and extended warranty only apply the first time a dealer sells a buyback vehicle after it was refurbished by the manufacturer.  However, we cannot read into the statute something that is simply not there.  Nowhere in the statutory language did the Legislature include a limiting provision for the statute's applicability; rather, the statute plainly governs all buyback vehicles that "are sold, leased, transferred, or replaced by a dealer or manufacturer in Indiana" regardless whether this involves a first resale or the tenth.  I.C. § 24-5-13.5-1; *See State v. Oddi-Smith*, 878 N.E.2d 1245, 1248 (Ind. 2008) ("The best evidence of legislative intent is the language of the statute itself[.]").  As such, the Legislature unambiguously ordered that after a buyback vehicle has been corrected by the manufacturer, it "may not be resold" unless the dealer provides the extended warranty and discloses the vehicle's condition to the buyer with the written statement.

---

[5] The Attorney General's statement reads, in pertinent part, as follows:

> The manufacturer is required to obtain a new title with a brand or stamp:  "Manufacturer Buyback-Disclosure On File."  This stamp or brand should remain on the vehicle's title for the life of the vehicle.  *The first time* a dealer sells a replaced or repurchased lemon, the dealer must provide the buyer with:
>
> -   Written notice, at the time of sale, that the vehicle was repurchased or replaced under the Lemon Law, and
> -   A 12-month or 12,000 mile manufacturer's warranty.

http://www.in.gov/attorneygeneral/2544.htm (last visited Jan. 18, 2018) (emphasis added).

Accordingly, as Penske Chevrolet admitted to not having provided Boots with the disclosure statement and extended warranty, Penske Chevrolet violated the statute.

[16] In an effort to avoid a reversal of the trial court's decision, Penske Chevrolet alleges that "Boots *knew* the Corvette was a Lemon Law buyback *before* he decided to purchase it." (Appellee's Br. p. 13). In support, Penske Chevrolet points to Boots' Complaint, in which Boots concedes that after he arrived in Indiana and had agreed to purchase the Corvette, "Penske [Chevrolet] then orally advised [Boots] that the Corvette had previously been a lemon buyback." (Appellant's App. p. 8). However, knowledge by the buyer is not an avenue to avoid the application of the statute as the statutory requirements of the written disclosure statement and extended warranty are imposed on the dealer regardless of the buyer's prior knowledge. Therefore, we reverse the trial court's entry of summary judgment for Penske Chevrolet on the issue of the Buyback Vehicle Disclosure Law and enter summary judgment for Boots.

### III. *Fraud*

[17] Next, Boots contends that his uncontroverted designated evidence establishes that Penske Chevrolet committed fraud during the sale of the Corvette. Pointing to the 'We Owe' form, Boots claims that "Penske Chevrolet gave Boots knowingly false information in order to complete the sale," as it "knew that the sale may not go through if it did not assure [Boots] that the title was clean." (Appellant's Br. pp. 15-16).

[18] As noted by our supreme court, the elements of common law fraud are "(1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of." *Kesling v. Huber Nissan, Inc.*, 997 N.E.2d 327, 335 (Ind. 2013). "Fraud is not limited only to affirmative representations; the failure to disclose all material facts can also constitute actionable fraud. *Id*. In particular, "[w]hen a buyer makes inquiries about the condition, qualities, or characteristics of property," the seller must "fully declare any and all problems associated with the subject of the inquiry," or else risk liability for fraud. *Id*. (citing *Lawson v. Hale*, 902 N.E.2d 267, 275 (Ind. Ct. App. 2009)).

[19] Those settled principles are enough for Boots' fraud claim to survive summary judgment. The uncontroverted designated evidence reflects that while Boots had started signing the paperwork, leading to the purchase of the Corvette, Fiene approached Boots with the Carfax report and informed him that "shortly after it was new the vehicle became a manufacturer buyback. It was then fixed, he said, and everything with the vehicle was fine now." (Appellant's App. p. 80). At that point Boots stopped signing the paperwork and inquired whether the Corvette had a rebuilt title. Fiene responded that "everything with the certificate of title was fine." (Appellant's App. p. 80). After Fiene presented Boots the 'WE OWE' form which included the statement that "the State of Indiana did not brand the title to this 2005 Corvette," Boots was assured that

the value of the Corvette would not be substantially impaired and continued to sign the purchase documents. (Appellant's App. p. 82). More than a year later, Boots discovered that the Corvette's title was branded as a buyback.

[20] Similarly, there is evidence to support an inference that Fiene knew his statements to be false, but made them anyway with intent to deceive Boots. Fiene had the Carfax report in his hand and was consulting it when informing Boots that the Corvette had a "lemon history." (Appellant's App. p. 80). That same Carfax report was used more than a year later by a dealership to advise Boots that the title to his Corvette was branded. Furthermore, even though Boots specifically inquired after the condition of the vehicle's title, Fiene assured him that it was "fine." (Appellant's App. p. 80). While, admittedly Boots asked whether the Corvette's title had been "rebuilt," Fiene's omission to inform Boots of the buyback brand on the certificate of title runs afoul of the related duty to "fully declare any and all problems associated with the subject of" a buyer's inquiry "about the condition, qualities or characteristics of property." *Lawson*, 902 N.E.2d at 275.

[21] Referencing the *in pari delicto* theory, Penske Chevrolet contends that Boots "sought to obtain a certificate of title devoid of the required buyback brand, presumably in order to benefit himself at the expense of the next down-stream purchaser." (Appellee's Br. p. 18). "So irrespective of the 'We Owe' document given to Boots, he can maintain no claim under color of its assurances, which were contrary to law at his request." (Appellee's Br. p. 19).

[22]     The doctrine known by the Latin phrase *in pari delicto* literally means 'of equal fault.' *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. Ct. App. 1975), *reh'g denied*. It is characterized as "[p]laintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." *Id*. In other words, "where the wrong of both parties is equal, the position of the defendant is stronger." *Id*. This maxim, applicable to the law of contracts, signifies that neither court of equity nor one of law will provide a remedy where such a situation is presented. *Id*.

> The existence or nonexistence of confidential relations between the parties in fault is an important element in determining whether they are *in pari delicto*. There are numerous cases in which conveyances were set aside, notwithstanding the illegality of the original transaction, where it was deemed that, because of fraud, duress, oppression, imposition, or undue influence, one party was more guilty than the other in inducing the act. When a relation of trust or confidence exists, . . ., and the party in whom trust is reposed has obtained a benefit, the burden will be upon him to show that the transaction was fair and proper; and relief will not be denied the one least at fault if he has been led into the illegal transaction because of ignorance and reliance upon and trust in the other.

*Novak v. Nowak*, 25 N.E.2d 993, 994 (Ind. 1940).

[23]     Penske Chevrolet did not present this court with any designated evidence indicating a cooperation between Boots and Fiene to construct an illegal transaction, let alone evidence from which such cooperation can be inferred. Rather, the evidence suggests that Boots only sought assurances about the condition of the title. Fiene told him it was fine. Boots asked to have that

documented in writing and Fiene obliged. Boots never requested a title devoid of the Buyback brand, nor did he ask to change the title. Instead, because he stopped signing the paperwork, it can be inferred that Boots would have walked away from the sale if he had been told the title was branded, as it would have "significantly impair[ed] [the Corvette's] value." (Appellant's App. p. 80). Because of Fiene's assurance, Boots was deprived of the opportunity to make the informed decision of whether to purchase a Corvette with a branded certificate of title. Accordingly, as there is no genuine issue of material fact that Penske Chevrolet committed fraud in the sale of the Corvette, we reverse the trial court's entry of summary judgment for Penske Chevrolet on Boots' fraud claim and enter summary judgment in favor of Boots as a matter of law.

# CONCLUSION

[24] Based on the foregoing, we hold that the trial court erred by granting summary judgement to Penske Chevrolet on Boots' statutory and fraud claims. We reverse the trial court's entry of summary judgment and enter summary judgment in favor of Boots as a matter of law.

[25] Reversed and remanded for further proceedings.

[26] Baker, J. and Brown, J. concur