SHERATON CORPORATION OF AMERICA AND SHERATON OPERATING CORPORATION *v.* KINGSFORD PACKING COMPANY, INC.

[No. 3-773A85. Filed December 17, 1974.]

*Milford M. Miller, Edward L. Murphy, Jr., Livingston, Dildine, Haynie & Yoder,* of counsel, of Fort Wayne, for appellants.

*Thomas S. Locke, Maxwell P. Smith, Parry, Krueckeberg & Smith,* of Fort Wayne, for appellee.

HOFFMAN, C.J.—The instant appeal is brought by defendant-appellant Sheraton Operating Corporation (Sheraton) from a judgment in favor of plaintiff-appellee Kingsford Packing Company, Inc. (Kingsford) in an action to recover the purchase price of certain foodstuffs furnished by Kingsford to the Sheraton-Fort Wayne Motor Hotel (the Hotel).

Kingsford's complaint alleged that Sheraton had refused to pay for meat and other food items ordered from Kingsford

by the Hotel and delivered to the Hotel, and sought the balance due on the Hotel's account of $1,077.69, plus interest. The trial court entered a judgment against Sheraton in the sum of $1,202.31 after a trial to the court. Sheraton timely filed a motion to correct errors, which was overruled, and this appeal was perfected.

The facts and inferences most favorable to appellee-Kingsford in the record before us establish that Kingsford furnished foodstuffs to the Hotel from the time of its initial opening in 1968 to May, 1971, when the non-payment of the Hotel's bill apparently caused Kingsford to cease furnishing such items.

This relationship between the parties commenced when Kingsford's sales manager, "Russ" Fahl (Fahl) contacted one Thomas James Porter (Porter) with regard to furnishing foodstuffs to a new Sheraton Hotel which was about to open in Fort Wayne, Indiana. Porter had come to Fort Wayne to hire employees for the new hotel. After being contacted by Fahl, Porter inspected Kingsford's facilities, stating that he was "food and beverage manager" with the Sheraton, and that certain Sheraton meat cutting specifications had to be met to secure their business. Following his visit, the Hotel began to order food items from Kingsford.

At about this time, Porter introduced Kingsford salesman Guy Hall (Hall) to the Hotel chef. Hall then frequently visited Porter and the chef in the Hotel to service the account during the time that Kingsford delivered food items to the Hotel kitchen. At a later time, Porter represented to Hall that because he (Porter) worked for Sheraton, he could obtain meat from it in Chicago at a price lower than Kingsford's.

The Hotel was billed monthly under the name "Sheraton." This extension of credit to the Hotel through the month was approved by Kingsford's Vice-President and Treasurer, Laurel J. Short (Short) on the basis of past dealings with appellant-Sheraton. Payments on the account here at issue were received in the form of checks which bore the name "Sheraton-Fort

Wayne Motor Hotel", and usually Sheraton's registered trademark.

Early in 1971, the Hotel failed to pay several invoices which were billed to it by Kingsford, and Short discussed the matter on several occasions with the Hotel's accounts payable bookkeeper. Later, Kingsford received a "bankruptcy notice" which listed it as a creditor of Fort Wayne Investment Company, Inc. (Investment Company) by reason of its transactions with the Hotel. Prior to this time, the Investment Company's name had never been mentioned to Kingsford through conversation, correspondence, checks or otherwise.

Sheraton and the Investment Company had entered into an intricate 27-page contract with regard to the construction and operation of the Hotel. Pursuant to such contract, the Investment Company constructed the Hotel under the direction of Sheraton and designated Sheraton as the "exclusive operator" of the Hotel.

This contract also provided that prior to the opening of the Hotel, Sheraton would perform the following services:

### "ARTICLE IV

#### *"Pre-Opening Services by Operator*

"Operator [Sheraton] shall do the following:
"A. Recruit, train, direct and employ an initial staff for the Hotel.
"B. Initiate and prosecute promotion, publicity and other like functions designated to attract guests to the Hotel on and after the Opening Date.
"C. Negotiate leases, licenses and concession agreements for stores, office space and lobby space at the Hotel subject to Owner's [Investment Company] approval. All leases, licenses or concessions shall be in Owner's name and executed only by officers of Owner on its behalf.
"D. Apply for, process and take all necessary steps to procure (in Operator's name or Owner's name or both as may be required by the issuing authority) all licenses and permits required for the operation of the

Hotel, and its related facilities including, without limitation, liquor and restaurant licenses.

"E. Do all other things necessary for the proper opening of the Hotel, including without limiting the foregoing, the purchase of all inventories, supplies and provisions."

The rights and duties of Sheraton and Investment Company after the opening of the Hotel were governed, in part, by the following language in the contract:

## "ARTICLE V

*"Operation of the Hotel on and After Opening Date*

"On and after the Opening Date the Operator shall have the *exclusive right to direct, supervise, manage and operate the Hotel and determine the programs and policies to be followed in connection therewith,* all in accordance with the provisions of this Agreement.

"Without limiting the generality of the foregoing, Operator shall be and is hereby granted the authority to do the following:

"A. *In the name and on behalf of the Owner to employ, pay, supervise and discharge all employees and personnel* necessary for the operation of the Hotel, including the manager of the Hotel. *Each person so hired shall be the employee of Owner and not of Operator* except that the Hotel manager and other executive personnel may be on the payroll of 'Sheraton' and their salaries and other related expenses charged to the Hotel's operation. In no event shall any employee be paid a salary greater than at the rate of $15,000 per year without Owner's approval of the pay rate.

Permission is hereby given to the Operator to enter into a contract or contracts with an applicable union or unions *in Owner's name.*

To the extent that Operator deems advisable and in Owner's best interests, such authority to employ, pay, supervise and discharge, or any part thereof, may be delegated by Operator to one or more persons in its general employ or to the manager of the Hotel. Each person to whom any such duty is delegated shall be the agent of Owner and not of Operator for the

purpose of employing, paying, supervising and discharging.

*Every person performing services in connection with this Agreement, including any agent or employee of Operator, 'Sheraton' or their affiliates or any agent or employee of Owner hired by Operator, shall be acting as the agent of the Owner.*

Operator in its discretion may provide food and lodging for Hotel employees, and allow the general manager of the Hotel suitable living quarters within the Hotel and the use of all Hotel facilities.

\* \* \*

"C. Negotiate leases, license and concession agreements for stores, office space and lobby space at the Hotel subject to Owner's approval. *All such leases, licenses or concessions shall be in Owner's name and executed only by officers of Owner on its behalf.*

\* \* \*

"F. Supervise and purchase or arrange for the purchase in the most economical manner of all inventories, provisions, supplies and Operating Supplies which in the normal course of business are necessary and proper to maintain and operate the Hotel. *In Operator's discretion, all or any part of such purchases may be made in Operator's or Owner's name.*" (Emphasis supplied in part.)

The contract further provided:

## "ARTICLE XVI
### "Use of Name Sheraton

"*During the term of this Agreement, the Hotel shall at all times be known and designated as the 'Sheraton Motor Inn'* or such other name as, from time to time may be selected by the Operator subject to the approval of Owner. *During such term, Owner shall not use or refer to the word 'Sheraton' other than in connection with the Hotel.* Upon the termination of this Agreement, such portion of the name as does not contain the word 'Sheraton' and the right to the use thereof shall continue to be the exclusive property of Owner. However, thereafter neither Owner nor any other owner or operator of the Hotel shall have the right to use the word 'Sheraton' or other Sheraton trademarks, emblems, insignias, slogans, or distinguishing characteristics in connection with the operation of the Hotel. \*\*\*." (Emphasis supplied.)

The trial court herein rendered a general finding in favor of plaintiff-appellee Kingsford. Consequently, this court is bound to affirm the decision of the trial court on any theory which is supported by the evidence. *In re Estate of Barnett* (1974), 159 Ind. App. 491, 307 N.E.2d 490; *Lindenborg* v. *M & L Builders & Brokers, Inc.* (1973), 158 Ind. App. 311, 302 N.E.2d 816.

The essence of plaintiff's cause of action herein was breach of contract. It is undisputed that Kingsford and the Hotel had ongoing business dealings, and that Kingsford sold the food items that are the *quid pro quo* for which it sought compensation through this lawsuit. Thus, the central issue confronting the trial court was whether Sheraton should be held responsible for the debts of the Hotel.

In our opinion, there was ample evidence admitted without objection to allow the trial court to find that by reason of its acts, Sheraton should be estopped to deny that it and its franchisee are a single entity for the purposes of the instant case.

In order to establish an equitable estoppel or estoppel *in pais* in Indiana it must be shown that there existed a false representation or concealment of material facts made with actual or constructive knowledge of the true state of facts; such representation must be made to one who is without knowledge or reasonable means of knowledge of the true facts with the intent that he rely upon it; and the second party must rely or act upon such representation to his damage. *Justice et al.* v. *Mid-State Homes* (1970), 146 Ind. App. 662, 257 N.E.2d 843; *Schill* v. *Choate* (1969), 144 Ind. App. 543, 247 N.E.2d 688; *ITT Cannon Elec., Inc.* v. *Brady* (1967), 141 Ind. App. 506, 230 N.E.2d 114; *Voorhees-Jontz Lum. Co.* v. *Bezek* (1965), 137 Ind. App. 382, 209 N.E.2d 380; *Richardson* v. *St. Mary's Hospital, Inc.* (1963), 135 Ind. App. 1, 191 N.E.2d 337; 31 C.J.S., *Estoppel,* §§ 67-77, at 402.

It is settled law in this State that the representation of fact necessary to such an estoppel may be accomplished by "the conduct of a party, using the word 'conduct' in its broadest meaning as including his spoken words, his positive acts and his silence when there is a duty to speak." *Johnson* v. *Western, etc. Mining Co.* (1923), 81 Ind. App. 79, at 81, 140 N.E. 559, at 560 (transfer denied). See: *Emmco Insurance* v. *Pashas* (1967), 140 Ind. App. 544, 224 N.E.2d 314; *Voorhees-Jontz Lum. Co.* v. *Bezek, supra.* However, whether such conduct shall operate as an estoppel depends largely upon the facts and circumstances of each particular case. *Johnson* v. *Western, etc. Mining Co., supra.*

Under the terms of the contract enumerated hereinabove, Sheraton required the Investment Company to refer to its hotel business at all times as the "Sheraton" motor inn. Also, under the contract terms, Sheraton was engaged as the "exclusive operator" of the Hotel for the Investment Company. Based on these provisions, the trial court could have concluded that when Sheraton performed pre-opening and operational services such as hiring employees, negotiating leases and concessions, procuring the necessary licenses and permits, and purchasing inventory and supplies for the Hotel, it acted as the delegatee of all the Investment Company's duties under the contract and, therefore, was bound to transact such business under its own name: "Sheraton."

Although Sheraton was solely responsible for the operation of the Hotel under the contract, the contract further provides that:

> "*Every person* performing services in connection with this Agreement, including any agent or employee of Operator [appellant-Sheraton Operating Corp.] 'Sheraton' [Sheraton Corp. of America] or their affiliates or any agent or employee of Owner [Fort Wayne Investment Co.] hired by Operator, shall be acting as the agent of the Owner."

In light of this and the other provisions of the contract discussed and quoted hereinabove, the trial court could have

further concluded that the contractual scheme under consideration here was intended by Sheraton to operate so as to allow it to deal in its own name with no indication to third parties that it and its employees acted as the agents of Investment Company, presumably with no liability to itself by reason of the separate corporate entities involved.

Thus it appears that Sheraton knowingly permitted its trade name to be used in the course of business by a separate entity without qualification or indication of separate ownership, actively assisted that separate entity to appear identical to Sheraton in terms of physical facilities, management, services, and policies, and actively participated in the operation and management of such separate business entity. This course of conduct would support a finding by the trial court that Sheraton made a representation of fact that it was the owner of the Hotel. Inasmuch as such representation falsely indicated to Kingsford that Sheraton was the owner of the Hotel, and thus the entity with whom Kingsford dealt, at a time when Sheraton well knew that another entity in fact owned the Hotel and was dealing with Kingsford, it is a sufficient representation to serve as the basis of an equitable estoppel against Sheraton to deny that it dealt with Kingsford.

However, such an estoppel cannot be established herein solely upon the making of such a representation. Additionally, it must be shown that Kingsford was without knowledge or reasonable means of knowledge of the true facts, that Sheraton intended that Kingsford rely on the representation, and that Kingsford did rely thereon to its detriment.

The record before us discloses no actual notice or attempts to give actual notice to Kingsford that it was dealing with a local investment company rather than a prosperous, nationally active corporation. Indeed, the only evidence on this point discloses that Kingsford never received any correspondence or checks bearing Investment Company's name, and that the

Hotel employees never represented themselves as employees of the Investment Company.

The record further discloses that the Investment Company filed a "Certificate of Use of Assumed Name" with the Allen County Recorder under authority of IC 1971, 23-15-1-1 (Burns Code Ed.) to give third parties constructive notice that it was doing business as the "Sheraton-Fort Wayne Motor Hotel." This statute provides, in pertinent part, as follows:

"Partnerships, persons, businesses and corporations—Names—Filing certificates—Records and index—Dissolution notice—Cost of recording—Copy of certificate to secretary of state.—Except as otherwise provided in section 2 [23-15-1-2] of this act, every person, firm or partnership, conducting or transacting business in this state under any name, designation or title other than the real name or names of the person or persons conducting or transacting such business, whether individually or as a firm or partnership, and every corporation conducting business in this state under any name, designation or title other than the name of such corporation as shown by its articles of incorporation, or amendment thereto, on file with the secretary of state of Indiana, shall file for record, in the office of the recorder of each county in which a place of business or an office of such person, persons, firm or partnership, or corporation is situated, a certificate stating the assumed name or names to be used, and in the case of a person, persons, or firm or partnership, the full name and the residence address of each person engaged in or transacting such business, or, in the case of a corporation, the full name and the address of the principal office in this state of such corporation. ***.

"*Any corporation subject to this act shall,* in addition to filing the certificate provided for above, *also forthwith file with the secretary of state of Indiana a copy of each such certificate,* duly certified by the proper county recorder as a true copy of the certificate as on file in the office of such recorder." (Emphasis supplied.)

IC 1971, 23-15-1-3 (Burns Code Ed.) provides that a fine be levied against persons, firms, partnerships, or corporations violating the filing requirements of IC 1971, Title 23, Article 15, Chapter 1.

Because this statute is a penal statute in derogation of the common law, it must be strictly construed. However, it does not invalidate contracts entered into in violation of its terms. *Humphrey* v. *City Nat. Bank* (1921), 190 Ind. 293, 130 N.E. 273. The purpose of this statute is to protect the public from fraud and imposition by preventing business entities from concealing their identity. *Rerick* v. *Ireland* (1921), 76 Ind. App. 139, 131 N.E. 527.

This court will take judicial notice of documents filed with the Secretary of State. *Merriman* v. *Standard Grocery Co., Inc.* (1968), 143 Ind. App. 654, 242 N.E.2d 128 (transfer denied). An examination of the documents filed by the Fort Wayne Investment Co., Inc. with the Secretary of State discloses that no such "Certificate of Use of Assumed Name" has been so filed by the Investment Company. Absent strict compliance with the filing requirements of the statute now under consideration, Kingsford cannot be charged with constructive notice of the Investment Company's use of an assumed name. *Vizzard* v. *Taylor, Treasurer* (1884), 97 Ind. 90. Thus, it must be concluded upon the facts present herein that Kingsford had no knowledge or reasonable means of knowledge that an entity other than Sheraton was the purchaser of its goods. Furthermore, it must also be concluded that this lack of knowledge on Kingsford's part is directly chargeable to Sheraton inasmuch as it allowed another entity to use its name in the same business without ensuring that third parties were given actual or constructive notice of such fact.

Sheraton's intent that third parties act upon its use of its own name on behalf of the Investment Company must next be considered. It has been stated that such intent is sufficiently shown

> ". . . if the acts, representations, or silence relied on are of such a character as to induce a reasonable and prudent man to believe that they were meant to be acted on; and it is also sufficient that the conduct of a party occurred under such circumstances that he should have known that

it was both natural and probable that it would be acted on." (Footnotes omitted.) 31 C.J.S., *Estoppel,* § 69, at 416.

In the instant case it must be said that it is natural and probable that a reasonable and prudent businessman would be expected to rely upon the usage in the course of business of the trade name of a corporation. Thus, Sheraton's intent that third parties rely upon the usage of its name may be readily inferred.

Furthermore, in the case of *Merriman* v. *Standard Grocery Co., Inc., supra,* at 657 of 143 Ind. App., at 130 of 242 N.E.2d, this court stated:

"We believe it necessary to indulge in the presumption that large corporations often deliberately structure the parent and wholly-owned subsidiaries of the parent corporation in such a complex and inter-related manner so as to prevent ascertainment of exactly which corporate entity shoulders the responsibility of liability to injured individuals. We have no evidence in the case at bar to sustain this presumption and do not deem it necessary that there be such evidence."

This reasoning is equally applicable to franchising arrangements wherein the parties contract to conduct business so as to appear to reasonably diligent third parties to be a single entity which is owned by the franchisor. This presumption, when coupled with the evidence in the record that Sheraton has acted to create a confusion of its and the Investment Company's identities, serves as an additional basis upon which an intent that third parties rely upon its name when used on behalf of its franchisees may be attributed to Sheraton.

The last element of estoppel which must be found herein to affirm the judgment of the trial court is detrimental reliance by Kingsford upon the representations of Sheraton. The record discloses that credit was extended to the Hotel through the month and that the Hotel was billed in the name "Sheraton"; that substantial dollar amounts of food were delivered to the Hotel and Kingsford has not been paid for $1,077.69

in invoices for such food; and that on the basis of previous dealings, Sheraton's credit was considered to be "the best" by Kingsford. It is apparent that Kingsford placed reliance on Sheraton's representation to its misfortune.

In *Clarke Auto Co.* v. *Fyffe, etc.* (1954), 124 Ind. App. 222, at 230, 116 N.E.2d 532, at 536, this court stated:

"The whole record herein indicates the business of these corporations was conducted in such a manner that innocent third parties had no way of knowing with which they were dealing. They could only rely on the word of the officers and employees of these companies. That is what happened in this case. Under such circumstances it would be an open invitation to fraud and injustice to say appellant can now escape liability because it asserts the latter corporation made the sale. The law will not tolerate such chicanery. Under the authorities cited above, we are of the opinion the entity of these corporations for the purpose of this case was merged." See also: *Merriman* v. *Standard Grocery Co., Inc. supra.* Cf: *Kuchta* v. *Allied Builders Corporation* (1971), 21 Cal. App.3d 541, at 547-48, 98 Cal. Rptr. 588, at 591; *Beck* v. *Arthur Murray, Inc.* (1966), 245 Cal. App.2d 976, 54 Cal. Rptr. 328.

The judgment of the trial court is affirmed.

Affirmed.

Garrard and Staton, JJ., concur.

NOTE.—Reported at 319 N.E.2d 852.