Joe C. CLARK, Plaintiff-Appellant,

v.

The MILLIKIN MORTGAGE COMPANY, the Credit Life Insurance Company, and the Lincoln National Life Insurance Company, Defendants-Appellees.

No. 3–385A56.

Court of Appeals of Indiana, Third District.

July 23, 1986.

---

John Johnston, Johnston, Lehman & Guenin, Wabash, for plaintiff-appellant.

Richard De Laney, Gordon, Glenn, Miller, Bendall & Branham, Huntington, for defendant-appellee Credit Life Ins. Co.

John T. Snively, Palmer, Bowers & Brewer, Huntington, for defendant-appellee Millikin Mortg. Co.

Donald F. Noland, Fort Wayne, for defendant-appellee Lincoln Nat. Life Ins. Co.

GARRARD, Judge.

Clark commenced this action against Millikin Mortgage Company (Millikin) and The Credit Life Insurance Company (Credit Life) claiming that he was entitled to the benefit of a policy of mortgage cancellation insurance due to the death of his wife on June 6, 1982.

The trial court granted summary judgment since Clark had never submitted an application for insurance coverage. Clark appeals.

The depositions and other materials before the court on the motion for summary

judgment disclose that the Whitcomb Keller Mortgage Company (Whitcomb Keller) originally serviced the mortgage on Clark's home for the mortgagee. In addition to collecting payments, paying real estate taxes and homeowner's insurance, handling delinquent accounts and securing foreclosures, when necessary, Whitcomb Keller procured mortgage cancellation insurance for mortgagors, including the Clarks, from Lincoln National Life Insurance Company (Lincoln National). Premium payments for the mortgage cancellation insurance were collected by Whitcomb Keller as a part of the mortgagor's monthly payment and were remitted to Lincoln National.

In early 1981 Whitcomb Keller declared bankruptcy. When it could not reorganize, its mortgage servicing rights were auctioned by the bankruptcy court and were acquired by Millikin. Millikin was, however, unable to reach a servicing agreement with Lincoln National and mortgagors insured by Lincoln National were advised to pay premiums directly to Lincoln National.

Millikin received several complaints from mortgagors who wished to continue the convenience of making one monthly payment to cover both mortgage and insurance. As Millikin had reached a servicing agreement with Credit Life, Millikin suggested that mortgagors with Lincoln National coverage should be offered the opportunity to transfer over to Credit Life.

The Clarks, as mortgagors with Lincoln National coverage, received a letter in April 1981 offering to switch their coverage to Credit Life. To accept the offer they were merely to sign and return an enclosed application adding to it their birth dates.[1] Clark admitted that he and his wife decided to discontinue their coverage and so did not return the application. He also wrote to Millikin advising that he no longer desired mortgage cancellation insurance coverage. He then discontinued paying the $14.81 monthly premium amount with his mortgage payment.

According to Clark the following November he and his wife decided they should have mortgage cancellation coverage and he began sending Millikin an additional $14.81 in his monthly payment. It is undisputed that Clark did not directly advise Millikin of his desire to acquire mortgage cancellation insurance, nor was any notation placed upon his checks or the mortgage coupons. (Clark does assert that sometime in the months that followed he sent a note inquiring about his insurance coverage and that on three or four occasions he attempted to telephone a Mr. Meyers and told a secretary that he was calling about an insurance problem. These assertions were disputed by Millikin's affidavits.)

Following its standard practice for overpayments of less than $15, Millikin placed Clark's overpayments in an escrow account. (Millikin was servicing about 9800 monthly mortgage and loan payments in 1981. Overpayments under $15 were placed in escrow; those over $15 were placed in an unapplied funds account.) Millikin did not apply for a mortgage cancellation insurance policy for Clarks, and no policy was ever issued by Credit Life.

The principles we apply in reviewing summary judgments are summarized in *McKenna v. City of Fort Wayne* (1981), Ind.App., 429 N.E.2d 662, 664 and need not be repeated here.

I.

*The agency relationship between Millikin and Credit Life.*

Millikin and Credit Life admit that Millikin was in fact an agent of Credit Life.

---

1. The body of this letter read as follows:

"Dear Homeowner:

We have been asked by many of you to continue coverage on your mortgage life insurance (and disability insurance, if you have it) so that payment can be included with your mortgage payment.

You may now do this by simply *signing* the enclosed application(s), indicating your *dates of birth* and returning it in the enclosed envelope. A policy will be sent to you by The Credit Life Insurance Company showing your coverage. The *monthly cost* will be the *same* as before. Disability benefits may vary—consult the enclosed brochure." (emphasis in original)

From Clark's viewpoint Millikin's apparent authority would be defined by the letter he received from Millikin and Credit Life wherein it was indicated that a switch could be made from Lincoln National coverage to Credit Life coverage by signing an application, indicating one's date of birth and forwarding the application to Millikin. Additionally, Millikin and Credit Life had a servicing fee agreement in effect during the time that Clark's difficulties arose. The service fee agreement defined Millikin's actual authority as being able to offer insurance coverage to those mortgagors of Millikin who appeared to be in good health.[2]

■ The general rule regarding a principal's liability to third persons for the acts of his agent, as regards contractual (non-tort) liability, rests upon the determination of whether the acts of the agent were committed in the principal's behalf and within the actual or apparent scope of the agent's authority. *Estate of Mathes v. Ireland* (1981), Ind.App., 419 N.E.2d 782, 786; 1 I.L.E. *Agency* Section 70, p. 353 (West 1957); 3 Am.Jur.2d *Agency* Section 261, p. 627 (1962). On the other hand, a principal's liability for the tortious acts of his agent is based upon the doctrine of *respondeat superior* with the critical issue being whether the agent's tortious acts were done within the course and scope of the employment. *Estate of Mathes, supra;* 3 Am.Jur.2d *Agency* Section 267, p. 631 (1962).

■ Although it is undisputed that no insurance policy was ever issued to Clark by Credit Life, he seeks to estop Credit Life from denying the policy's existence because of the asserted conduct of Millikin, its agent. Despite the language employed in the complaint asserting breach of contract, the theory of recovery is clearly that

of an equitable estoppel. Equitable estoppel is based upon fraud, actual or constructive, and as such, sounds in tort rather than contract. *See* 12 I.L.E. *Estoppel* Section 21, p. 350 (West 1959).

Clark also seeks to hold Credit Life liable for Millikin's negligence in failing to procure the insurance or, alternatively, for failing to notify Clark that no insurance had been obtained. Clark's negligence arguments, like the equitable estoppel theory, seek to hold Credit Life liable for the tortious acts of its agent. Thus, both theories depend upon proof of legally culpable conduct on the part of Millikin. It is essentially at this point that both theories fail. We therefore conclude that summary judgment was appropriate.

## II.

*Equitable estoppel.*

The elements necessary to establish an equitable estoppel were outlined by Judge Hoffman in *Sheraton Corp. of Am. v. Kingsford Packing Co., Inc.* (1974), 162 Ind.App. 470, 319 N.E.2d 852:

"In order to establish an equitable estoppel or estoppel *in pais* in Indiana it must be shown that there existed a false representation or concealment of material facts made with actual or constructive knowledge of the true state of facts; such representation must be made to one who is without knowledge or reasonable means of knowledge of the true facts with the intent that he rely upon it; and the second party must rely or act upon such representation to his damage.

It is settled law in this State that the representation of fact necessary to such an estoppel may be accomplished by 'the conduct of a party, using the word 'con-

---

**2.** The pertinent portion of the service fee agreement provides:

"1. The Company [Credit Life] hereby grants authority to offer Mortgage Life and/or Mortgage Accident and Health coverage to debtors who appear to be in good health. The Policyholder [Millikin] shall have no authority to solicit or deliver other forms of policy or certificate of insurance for the Company other than those furnished by the Company to the Policyholder, and shall have no authority to change, alter, vary or waive any of the terms and conditions contained in such policies.

2. The Company agrees to pay and the Policyholder agrees to accept as full compensation for all services performed by or on behalf of the Policyholder a service fee of 30% of life and disability of such premiums as the Policyholder shall collect with respect to such certificates entrusted with Policyholder by the Company."

duct' in its broadest meaning as including his spoken words, his positive acts, and his silence when there is a duty to speak.' ... However, whether such conduct shall operate as an estoppel depends largely upon the facts and circumstances of each particular case."

162 Ind.App. at 474, 319 N.E.2d at 856 (citations omitted). In the instant case Clark has not argued that Millikin actively misrepresented any facts concerning his insurance coverage. Rather, Clark seeks to establish an estoppel based upon the inaction or silence of Millikin.

■ However, the law is well settled that for silence to give rise to an equitable estoppel it is not enough that there is an opportunity to speak. There must be an imperative duty to speak. *Martin v. Levinson* (1980), Ind.App., 409 N.E.2d 1239; *Kline v. Kramer* (1979), 179 Ind.App. 592, 386 N.E.2d 982; *Collins v. Dunifon* (1975), 163 Ind.App. 201, 323 N.E.2d 264.

Firstly, we note that there was nothing in the relationship between Clark and Millikin to impose upon Millikin a duty to procure insurance for Clark. It was not the agent or fiduciary of Clark and had no such contractual obligation.

Clark argues that nevertheless when (without bothering to say why) he commenced adding $14.81 to his monthly payment, he imposed upon Millikin the duty to realize that something was happening, to determine what it was, and then advise him that no insurance had been obtained. He contends the failure to do so gives rise to an estoppel. We disagree.

We agree that good business practice as well as common courtesy should lead a business to inquire concerning the meaning of overpayments. That is considerably different, however, from determining that as a matter of law the business acts at its peril when it fails to do so.

The record in the present case discloses that Millikin was handling some 9800 monthly loan payments in early 1981, and the number was steadily increasing. When processing these payments Millikin used a procedure whereby any overpayment under $15 was put into an escrow account and any overpayment over $15 was put into an unapplied funds account. This arbitrary handling of overpayments could be avoided if the mortgagor indicated on the coupon where he wanted the additional funds to go. The unapplied funds account is simply a depository utilized until enough overpayments are made by a mortgagor to constitute a regular payment. The escrow funds are used throughout the year to pay property taxes and certain kinds of insurance. (It cannot be said that such a business practice was unreasonable.)

■ Assuming *arguendo* that under the total circumstances here present a duty to speak might arise if Millikin had *actual* knowledge that Clark reasonably believed he had purchased and was paying for a policy of credit life insurance, the record before us falls far short of establishing any genuine issue in that regard. Admittedly, Clark rejected the application sent him. Admittedly, when he began sending in the additional $14.81 he sent no accompanying instructions or statement that he desired insurance. Admittedly, he made no notations on his mortgage payment coupons. His assertions, disputed by Millikin, that he later indicated to Millikin that he was "having a problem" with insurance, are insufficient to demonstrate any issue concerning the specific actual knowledge that might conceivably trigger a duty to speak. Summary judgment on the claim of estoppel was proper.[3]

### III.

*Negligence.*

Clark argues that one who undertakes to procure insurance and negligently fails to do so may be liable to the party injured thereby. He also contends that one who has undertaken to procure insurance has a

---

**3.** Estoppel also presupposes that Clark had no knowledge (actual or constructive) of the true state of facts. His year end statement from Millikin for 1981 showed no monies applied to credit life insurance. *See Barnd v. Borst* (1982), Ind.App., 431 N.E.2d 161, 168.

duty to reasonably notify the applicant if the coverage is unobtainable.

■ The fatal flaw in both these contentions as they relate to the case before us is that the duties argued are premised upon the undertaking of a task. There is nothing in the present record from which it may be inferred that Millikin ever undertook to procure credit life insurance for Clark. Millikin's failure to inquire as to why it was receiving extra money, or its failure to respond to Clark's note or calls (assuming they were made) may demonstrate sloppy business practice or lack of concern for its mortgagors, but these failures will not support the reasonable inference that Millikin undertook to procure insurance.

Clark's final argument in support of a duty owed to him by Millikin is drawn from a trial court instruction that was repeated by this court in *Shelby Federal Sav. and Loan Ass'n. v. Doss* (1982), Ind.App., 431 N.E.2d 493, at 501:

> "Customers place reliance for the protection of their interests on the integrity, faithfulness and watchfulness of employees of financial institutions. These duties and trusts by employees must be faithfully discharged. If these employees depart from this line of duty and *waste* instead of protect the customers' property, the institution may be held liable for restoring to the injured what has been lost." (emphasis in original)

Although the entire instruction was set forth, the issue dealt with the use of the word "waste," which the court determined referred to the common sense meaning of that word and not to any legal definition. The court's recitation of the entire instruction merely provided the background against which the use of the term "waste" was to be judged. It has no other precedential value. In *Doss*, the mortgagors were making payments regularly to Citizens Federal and then to Shelby Federal when it acquired Citizens Federal. After the switch to Shelby Federal the mortgagors noticed the balance due was not declining as it should have been. The mortgagors repeatedly tried to clear up this matter but for two years met with unresponsiveness from Shelby Federal. After mortgagors retained an attorney, Shelby Federal was informed they were applying the wrong interest rate to the mortgagors' account. Shelby Federal refused to admit the error and claimed they had the mortgagors' authorization to charge the higher interest rate. Judgment for the mortgagors awarding compensatory and punitive damages was affirmed on appeal.

■ In the case before us, Millikin never agreed or undertook to procure mortgage cancellation insurance for the Clarks other than its joining with Credit Life in the original offer to switch insurance coverages which the Clarks expressly rejected. Under the standard articulated in the *Doss* instruction, Millikin's duty toward the Clarks was to properly apply their mortgage payments. In the course of discharging this duty Millikin's policy was to place overpayments received from customers into one of two accounts. Overpayments of less than $15 were placed in an escrow account from which the mortgagor's property taxes and other insurance were paid. Overpayments of more than $15 were placed in an unapplied funds account from which additional mortgage payments would be made once a sufficient amount had accumulated. The Clarks' funds or property were not wasted under this procedure. They were protected and accounted for. Millikin's procedure adequately discharged its duty owed to the mortgagors whose payments it accepted.

### IV.

*Conclusion.*

■ On appellate review summary judgment should be affirmed if sustainable upon any basis found in the record. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 157.

Credit Life required written application for its policies and Clark submitted none. Furthermore, Credit Life was not estopped to deny coverage nor was it liable on the

theory of *respondeat superior* since Millikin was not guilty of actionable negligence.

The summary judgment is affirmed.

STATON, P.J., and HOFFMAN, J., concur.