**In re DUPONT FEED MILL CORPORATION, Debtor.**

**In re RUSHVILLE NATIONAL BANK, Appellant and Cross–Appellee,**

v.

**WELLS FARGO BANK, Appellee and Cross–Appellant.**

**No. NA 89–4–C.**
**Bankruptcy No. NA 84–1486.**
**Adv. No. 86–0492.**

United States District Court,
S.D. Indiana,
New Albany Division.

Dec. 3, 1990.

John R. Price, Burroughs & Price, Indianapolis, Ind., for appellant and cross-appellee.

J. Anthony Goebel, Joan Lloyd Cooper, Wyatt, Tarrant, Combs & Orbison, New Albany, Ind., for appellee and cross-appellant.

## DECISION

BARKER, District Judge.

This matter is before the court on an appeal by the Rushville National Bank ("Rushville") and a cross-appeal by the Wells Fargo Bank ("Wells Fargo"). Rushville appeals the bankruptcy court's grant of summary judgment determining that Wells Fargo had a prior security interest in $95,000, which amount represented the proceeds from the sale of fertilizer previously owned by Dupont Feed Mill Corporation ("Dupont Feed"), the debtor. Wells Fargo appeals the failure of the bankruptcy court to award it pre-judgment interest. For the reasons stated below, the decision of the bankruptcy court is AFFIRMED in part and REMANDED for further action consistent with this opinion.

### *Memorandum*

A district court, sitting in review, considers a bankruptcy court's decision to grant summary judgment *de novo*. *In re Two S Corp.*, 875 F.2d 240, 242 (9th Cir. 1989). The standard for granting summary judgment in an adversarial bankruptcy proceeding is the same as under Rule 56(c). F.R.Bankr.P. 7056. Summary judgment is appropriate if, in viewing the evidence in the light most favorable to the party opposing the motion, the court finds that there is no genuine issue of material fact. *In re Two S Corp.*, 875 F.2d 240, 242 (9th Cir. 1989).

I. Background.

The case below was submitted to the bankruptcy court on stipulated facts. In addition, the bankruptcy court made further findings of undisputed fact in ruling on the cross motions for summary judgment. The court's findings reveal that on December 2, 1981, a Promissory Note in the principal amount of $300,000 was executed and delivered to Wells Fargo by Dupont Feed. The Note was signed, "Dupont Feed Mill Corporation, by William Wildman, President." On April 12, 1982, Dupont Feed executed a "Continuing Security Agreement" in favor of Wells Fargo which granted a security interest in:

All accounts, deposit accounts, accounts receivable, chattel paper, instruments, documents, and general intangibles as defined in the California Uniform Commercial Code—Secured Transactions (collectively called rights to payments), now existing at any time or hereafter arising from the conduct of the Debtor's business (whether they arise from the sale, lease, or other disposition or inventory or from performance of contracts services, manufacture, construction, repair or otherwise), including all securities, guarantees, warranties, indemnity agreements, insurance policies and other agreements pertaining to the same or the property described therein, and in all goods returned by Debtor's customers, *together with a security interest in all inventory, goods held for sale or lease* or to be furnished under contract of service, goods sold, leased or furnished, raw materials, component parts, work in progress or materials used or consumed in Debtor's business (hereinafter called inventory) *now or at any time hereafter, and prior to the termination hereof, owned or acquired by Debtor where ever located*, and all products thereof (hereinafter called products), whether in the possession of Debtor, warehousemen, bailers, or other persons and whether located at Debtor's place of business or elsewhere, *together with whatever is receivable or received when any of the foregoing or the proceeds thereof are*

*sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary,* including without limitation all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all rights to payment with respect to any cause of action affecting or relating to the foregoing (hereinafter called the 'proceeds').

(emphasis supplied). This Security Agreement was signed "Dupont Feed Mill Corporation, by William Wildman, President." The Security Agreement stated that the obligations secured all present and future indebtedness of Dupont Feed to Wells Fargo. Wells Fargo filed a financing statement on this security agreement with the County Recorder of Jefferson County on June 17, 1982 and with the Indiana Secretary of State on June 28, 1982.

In August, 1983, Wildman, through his attorney, contacted Rushville to inquire about receiving a $100,000 loan to purchase the Arlington Ag–Center ("Arlington"). This property was to be purchased by Wildman in his individual capacity. In the course of requesting the loan, Wildman issued a personal financial statement to Rushville. On September 26, 1983, Rushville agreed to loan Wildman $100,000 for the mortgage on the property. In addition to the loan to purchase the Arlington property, Wildman requested a loan from Rushville for operational expenses on the business. In this regard, Rushville agreed to extend a line of credit for $150,000 to William and Sandra Wildman d/b/a Arlington Ag–Center. Wildman testified that he orally informed Wells Fargo that Rushville would be financing his acquisition of Arlington.

On September 30, 1983, Dupont Feed executed a Demand Note to Wells Fargo in the principal amount of $725,000. Moreover, on December 31, 1983, Dupont Feed executed another Demand Note to Wells Fargo in the principal amount of $2,000,000.

On October 27, 1983, Wildman received title to the Arlington property and personally executed a mortgage note payable to Rushville for $100,000. Subsequently, Wildman leased the Arlington property to Dupont Feed.

On December 29, 1983, a Promissory Note in the amount of $150,000, payable to Rushville, was executed as follows: "Arlington Ag–Center: by William Wildman." On the same day, a cashiers check in the amount of $136,023.06 was issued to "William Wildman and Bergdon Company." [1] Also on December 29, 1983, Wildman and his wife executed a Continuing Guaranty to Rushville, stating the debt being guaranteed was the debt of "William Wildman— Arlington Ag–Center," at a maximum amount of $250,000.

On February 9, 1984, Rushville filed a financing statement with the Recorder of Rush County, Indiana. The financing statement listed "Arlington Ag–Center" as the Debtor, and further stated that it covered "all inventory, accounts receivable, equipment, furniture and fixtures located at Arlington Ag–Center."

The parties have stipulated that Arlington is a branch location of Dupont Feed and is not a separate corporation.[2]

On September 10, 1984, Dupont Feed filed its Chapter 11 Petition. Arlington was listed as an asset, while Wells Fargo and Rushville were listed as creditors.

Thereafter, on or about December 17, 1984, Rushville filed a financing statement with the Indiana Secretary of State's office covering the inventory of the Dupont Feed. In December, 1984 and January, 1985, Rushville took possession of and sold Arlington's fertilizer for the sum of $95,000 and credited Debtor's account that amount.

An adversary proceeding was commenced on January 29, 1985 by Rushville filing a complaint against Wildman d/b/a Arlington Ag–Center, Dupont Feed, Ted R. Todd as Trustee for Dupont Feed, and

---

**1.** The Bergdon Company is a company that supplied fertilizer to Arlington.

**2.** Although not part of the bankruptcy court's findings, it appears from the record before the court that Dupont Feed was composed of several branch locations each with different names.

Wells Fargo. On April 8, 1985, Wells Fargo filed a counterclaim against Rushville for conversion, asking for compensatory and punitive damages. In October of 1985, Rushville filed a Motion to Dismiss its claim against Wildman, which was granted in December, 1986. In September of 1986, the trustee petitioned the bankruptcy court to approve the assignment of his "strong arm" powers [3] to Wells Fargo. The record is not clear as to whether the bankruptcy judge ever signed the approval order.

The bankruptcy court determined that the sole issue was whether Rushville or Wells Fargo was entitled to the proceeds of the sale of the fertilizer. By determining that the fertilizer was inventory and that Wells Fargo was the first to file its financing statement securing its interest in that inventory, the bankruptcy court found in favor of Wells Fargo and granted its motion for summary judgment.

Both Rushville and Wells Fargo appeal the bankruptcy court's grant of summary judgment in favor of Wells Fargo. Rushville argues that the bankruptcy court erred when it found that the fertilizer in question was "inventory." Instead, it argues that the fertilizer was a "farm product." Such a characterization, Rushville argues would have validated its financing statement filed in Rush County, thereby perfecting its security interest in the fertilizer. In addition, Rushville argues that, even if the bankruptcy court was correct when it determined that the fertilizer was "inventory," the court erred when it determined that Rushville did not have a "purchase money security interest," which would have given it priority over Wells Fargo. Finally, Rushville argues that as a legal matter the bankruptcy court erred when it allowed the Trustee to assign his statutory avoidance powers.

Wells Fargo, on the other hand, appeals the failure of the bankruptcy court to award it pre-judgment interest as damages for Rushville's interference with its security interest in the collateral and for Rushville's violation of the automatic stay.

There are three primary issues before this court.

1) Whether Rushville has a perfected security interest in the collateral of Arlington which has priority over Wells Fargo's interest in the collateral of Dupont Feed.

2) Whether the bankruptcy court erred when it allowed the trustee to assign his rights of collection to Wells Fargo.

3) Whether Wells Fargo is entitled to pre-judgment interest on the amount it is owed from Rushville's sale of the collateral.

II. Analysis

A. Perfected Security Interests.

■ The existence of a properly perfected security interest is a question of state law. *Matter of Martin Grinding & Machine Works, Inc.*, 793 F.2d 592 (7th Cir. 1986). Indiana law governing the attachment and perfection of security interests is found in the Uniform Commercial Code ("the UCC") as adopted by Indiana Code §§ 26-1-9-101 *et seq.*

1. Characterizing The Collateral.

■ As an initial matter, Rushville challenges the bankruptcy court's determination that the collateral was inventory. Rushville asserts that the fertilizer is a "farm product." While such a characterization might seem logical and could possibly validate its Rush County financing statement,[4] it is not supported by the terms of the UCC.

The fertilizer at issue does not fall within the statutory definition of "farm products." Indiana Code § 26-1-9-109(3)

---

3. Section 544 of Title 11 of the United States Code allows the trustee in bankruptcy to avoid certain transfers of the debtor. This right is often referred to as the trustee's "strong arm" powers.

4. Indiana Code § 26-1-9-401(1) provides that:

The proper place to file in order to perfect a security interest is as follows:
(a) When the collateral is ... farm products ..., then in the office of the county recorder in the county of the debtor's residence....

states that goods are "farm products" if they are:

crops or livestock used or produced in farming operations or if they are products of crops or of livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations.

By definition, fertilizer cannot be deemed a "farm product"—it is neither a crop nor a product of a crop used in farming.[5] Instead, fertilizer, particularly potash, is composed of minerals. Rushville's citation to the *Encyclopedia of Chemical Technology* demonstrates that it is aware that "[t]he potash industry is essentially a mining and beneficiation industry." *Id.* p. 77. Consequently this court affirms the characterization of the fertilizer as inventory, because it was held primarily for sale or lease. Ind.Code § 26–1–9–109(4).

### 2. Erroneous Filing.

■ The only proper place to file a financing statement for inventory is with the Indiana Secretary of State's office. Ind. Code § 26–1–9–401(1)(c).

Rushville filed its financing statement listing a security interest in all of Arlington's "inventory, accounts receivable, equipment, furniture and fixtures" with the Rush County Recorder.[6] "Arlington Ag–Center" was listed as the debtor on this financing statement. Rushville seeks to convince this court that since it filed a financing statement covering Arlington's inventory with the Rush County Recorder's Office in February, 1984, it should fall within the terms of the Erroneous Filing provision in the UCC.[7] See Ind.Code § 26–1–9–401(2). However, Rushville's argument is again misguided.[8] The statute provides:

A filing which is made in good faith in an improper place or not in all of the places required by this section is nevertheless effective with regard to any collateral as to which the filing complied with the requirements of I.C. 26–1–9....

Ind.Code § 26–1–9–401(2). This provision requires that if the improper filing was made in good faith, it is effective only for the collateral for which it is properly filed. Consequently, the Rush County filing might have been sufficient for Arlington's equipment, farm products and accounts, if Arlington can be considered a "farming operation." See Ind.Code § 26–1–9–401(1)(a). However, since a financing statement covering a security interest in inventory can only be filed with the Secretary of State's office, Rushville's filing with the Rush County Recorder was invalid and can not be validated by the erroneous filing provision. See, *Citizens State Bank v. Peoples Bank*, 475 N.E.2d 324, 328 (Ind.App.1985).[9]

---

5. In addition, there is no evidence in the record to support the proposition that Arlington was engaged in "farming operations." Instead, there is evidence in the record that Arlington was in the business of selling, among other things, fertilizer.

6. Rushville eventually filed a financing statement with the Secretary of State in December, 1984, but this was after Dupont Feed filed for bankruptcy and in violation of the automatic stay imposed by 11 U.S.C. § 362(a).

7. Rushville's arguments on this point contradict its actions. The Rush County financing statement listed the debtor as "Arlington Ag–Center" without specifing whether this was an assumed business name. If, as Rushville claims, it made its loan to Wildman in his individual capacity, then it should have listed the debtor as "Wildman," not "Arlington Ag–Center." On the other hand, if Rushville was dealing with Arlington as a corporation, as would seem evident by its

financing statement, then it did not file in all the proper places. Section 9–401(1)(a) specifies that "if the debtor is a corporation [file] in the office of the county recorder in the county where the principal place of business, and in the office of the secretary of state...."

8. The court would be remiss if it did not point out that even if Rushville did fall within the Erroneous Filing Provision, its priority date would be February, 1984. Wells Fargo, however, filed in June of 1982. Therefore, Wells Fargo would still have a superior lien on the inventory, under Ind.Code § 26–1–9–312(5) (the first to file or perfect rule).

9. In addition, Rushville fails to fall within the second provision of § 9–401(2) wherein an erroneously filed financing statement nevertheless is effective against any other secured party who has knowledge of the contents of the financing statement. See, *Citizens State Bank v. Peoples*

■ In contrast, Wells Fargo filed a financing statement with the Indiana Secretary of State's office in June of 1982. The security agreement entered into between Dupont and Wells Fargo granted a security interest in Dupont Feed's "inventory now or at any time hereafter, and prior to the termination hereof, owned or acquired by Debtor where ever located...." Because the parties stipulated that Arlington was "a branch location and not a separate corporation," Wells Fargo's security interest in Dupont's inventory "where ever located" includes the fertilizer located at Arlington. As a result, Wells Fargo's security interest became perfected in June, 1982. Since it was the first to file, it has priority over other secured creditors as to the same collateral. Ind.Code § 26–1–9–312(5).

In addition, Rushville makes an argument in an effort to convince this court that Wells Fargo's filing under "Dupont Feed" was misleading and therefore erroneous. Essentially Rushville argues that it would not have been alerted to Wells Fargo's prior interest in the inventory because, had it searched the records, it would have searched under "Arlington," not "Dupont Feed." According to Rushville, to reward this type of behavior would be contrary to public policy. The court, however, can only assume that the reason Rushville is making this argument in terms of public policy is because it failed to check the files as a prudent creditor would have done.[10] To reward the carelessness of Rushville in this situation also would not be a good policy.[11]

3. Purchase Money Security Interest.

The exception to the "first to file or perfect" rule for purchase money security

interests in inventory is relevant in this case. See Ind.Code § 26–1–9–312(3).

■ As a second argument, Rushville claims that it had a valid purchase money security interest (PMSI) in the fertilizer that was in the possession of Arlington.[12] Under Indiana law, effective when these transactions transpired, a PMSI in inventory has priority over a conflicting security interest in the same collateral if:

(a) the [PMSI] is perfected at the time the debtor receives possession of the collateral;  and

(b) any secured party whose security interest is known to the holder of the [PMSI] or who, prior to the date of the filing made by the holder of the [PMSI], had filed a financing statement covering the same items or type of inventory, has received notification of the [PMSI] before the debtor receives possession of the collateral covered by the [PMSI];  and

(c) such notification states that the person giving the notice has or expects to acquire a [PMSI] in inventory by item or type.

Ind.Code § 26–1–9–312(3) (1982). In order to acquire priority, a purchase money secured creditor must satisfy each of these three requirements. Although their remark was directed at the current version of the UCC, Professors White and Summers have nonetheless aptly characterized this as "a feat of some consequence." J. White & R. Summers, *Uniform Commercial Code* § 26–5, at 512 (3d. ed. 1988).

---

*Bank,* 475 N.E.2d 324 (Ind.App.1985). It appears that this provision was inserted into the UCC to protect secured parties who filed earlier, albeit partially erroneous, financing statements. If a second secured party knew of the erroneously filed financing statement, then that second party could not take advantage of the first secured party's good faith mistake.

**10.** Although a search under Wildman or Arlington would have revealed no connection to Dupont, it would have been prudent to protect Rushville's rights.

**11.** Rushville was in the better position to avoid this entire situation by asking for more information regarding Wildman's connection with Du-

pont and its connection with Arlington. To impose such an obligation on a bank extending a $250,000 loan is not too great a burden.

**12.** Indiana Code § 26–1–9–107 defines a PMSI. "A security interest is a [PMSI] to the extent that it is:

    (a) ...

    (b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

Because Rushville filed its financing statement covering Arlington's inventory with the Rush County Recorder, its PMSI was not perfected when Arlington received the fertilizer. Ind.Code § 26–1–9–401(1)(c). Therefore, Rushville cannot be found to have a PMSI in the fertilizer. Ind.Code § 26–1–9–312(3)(a).

Assuming *arguendo* that the Rush County filing did qualify for treatment under the erroneous filing provision and that Arlington received the particular fertilizer after February 9, 1984, Rushville still does not meet the statutory requirements of Ind.Code § 26–1–9–312(3)(b). Section 9–312(3)(b) requires that for Rushville to have priority over Wells Fargo, Wells Fargo must have received notice of the PMSI from Rushville before Arlington received possession of the collateral covered by the PMSI. Since Rushville apparently never communicated with Wells Fargo and since the only "notice" that Wells Fargo received was conveyed by Wildman, Rushville does not come within this section of the UCC.[13] Consequently, whatever interest Rushville has in the fertilizer, it does not take priority over Wells Fargo.[14]

### B. Pre-judgment Interest.

■ Wells Fargo appeals the bankruptcy judge's failure to award pre-judgment interest on the amount owing it. That interest, Wells Fargo argues, should be comput-

---

13. Even if Wildman could effectively convey notice of Rushville's PMSI, there is some question whether oral notice is sufficient. See *White & Summer* at 513 n. 25. It is noteworthy that Indiana law was amended in 1985 to incorporate the 1972 redrafting of Article 9. The new provision of Indiana law requires that a PMSI in inventory will have priority only if the previous secured party is notified *in writing*.

14. In its brief, Rushville cites the case of *Sheraton Corp. of America v. Kingsford Packing Co., Inc.,* 162 Ind.App. 470, 319 N.E.2d 852 (1974) for the proposition that Rushville was justified in relying on Wildman's representations. That may be true, but in light of Rushville's stipulation that Arlington is not separate from Dupont Feed, its recourse is against Wildman, not Dupont Feed. Unfortunately for Rushville, it dismissed its suit against Wildman, who might have otherwise been liable on his personal guarantee.

---

ed from the date of "conversion" (i.e. the date that Rushville took possession of the collateral in the possession of Arlington) until the date of judgment in the bankruptcy court. It may be possible that Wells Fargo would be entitled to an award of damages, (i.e., pre-judgment interest) in certain circumstances, if Rushville willfully violated the bankruptcy automatic stay.[15] 11 U.S.C. § 362(a). The award of this damage interest, however, would not be a payment of interest on account of Wells Fargo's security interest. Such interest is only available to "over-secured" creditors. 11 U.S.C. § 506(b). Instead, the payment, if any, would be imposed against Rushville for violation of the stay. Since the bankruptcy court did not decide this issue, this court must remand to allow the bankruptcy judge an opportunity to rule on that request in the first instance.

### C. Trustee's Assignment to Wells Fargo.

Rushville argues that the assignment by the trustee of his rights under 11 U.S.C. § 544 to Wells Fargo was contrary to public policy. However, having concluded that Wells Fargo was a prior secured party with regard to the proceeds from the sale of the fertilizer, the court notes that the assignment by the trustee of its rights in the collateral is immaterial.[16] Section 544(b) of Title 11 of the United States Code gives the trustee power to avoid "... any obligation

---

15. Rushville's actions in filing its financing statement with the Secretary of State's office and repossessing the collateral was a violation of the automatic stay authorized by the Bankruptcy Code. 11 U.S.C. § 362(a). Accordingly, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, ...." 11 U.S.C. § 362(h).

Because Indiana law appears to treat the award of pre-judgment interest as an element of damages in conversion tort cases, *Fort Wayne Nat. Bank v. Scher,* 419 N.E.2d 1308 (Ind.App. 1981), an issue below will be whether Wells Fargo is entitled to pre-judgment interest as an element of damage.

It is important to note that in bankruptcy, one creditor may be forced to pay other creditors for violation of the automatic stay. See, *Homer Nat. Bank v. Namie,* 96 B.R. 652 (W.D.La.1989).

16. The assignment of the trustee's rights under § 544 did not give Wells Fargo any more rights

incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable." In this situation, however, Wells Fargo's claim to the proceeds from the sale of the collateral is a secured claim, hence it is not voidable. Moreover, under the UCC, a secured creditor with a properly perfected security interest in collateral takes priority over the interests of the trustee in bankruptcy. Ind. Code § 26–1–9–301. Consequently this court does not have to take a position on the public policy repercussions of the trustee's assignment, in so far as it relates to rights to the $95,000, proceeds from the sale of the collateral.

However, on remand, the bankruptcy court should determine what effect the assignment to Wells Fargo has on payments, if any, to the estate by Rushville for violating the automatic stay provision.

III. Conclusion.

For all the foregoing reasons, the bankruptcy court's decision is AFFIRMED in part and REMANDED for further action consistent with this decision.

It is so ORDERED.

in the proceeds of the collateral than it already possessed.