# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 02-3926

JAMES A. KNAUER as the Court Appointed Receiver for
HEARTLAND FINANCIAL SERVICES, INC. and JMS
INVESTMENT GROUP, LLC,

*Plaintiffs-Appellants*,

v.

JONATHON ROBERTS FINANCIAL GROUP, INC.; ALLIANCE
CAPITAL MANAGEMENT CORP.; ANDOVER SECURITIES, INC.;
FSC SECURITIES CORPORATION and FFP SECURITES, INC.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP01-1168-C-T/K—**John Daniel Tinder**, *Judge*.

_____

ARGUED MAY 29, 2003—DECIDED OCTOBER 22, 2003

_____

Before CUDAHY, EVANS and WILLIAMS, *Circuit Judges*.

CUDAHY, *Circuit Judge*.  Heartland Financial Services,
Inc., and JMS Investment Group, LLC, operated a Ponzi
scheme in the late 1990s that collected over $60 million
from hundreds of investors. In August 2000, in connection
with a Securities and Exchange Commission (SEC) action
against individuals and entities involved in the Ponzi
scheme, the district court appointed James A. Knauer as
receiver for Heartland and JMS. Subsequently, Knauer
began this lawsuit, alleging that the defendants were in

part responsible for losses resulting to Heartland and JMS. The district court dismissed Knauer's complaint, holding that the doctrine of *in pari delicto* bars Heartland and JMS from pursuing losses for which they themselves were largely culpable. We affirm.

I.

Because this case was dismissed under Fed. R. Civ. P. 12(b), we accept as true all well-pleaded factual allegations and draw all reasonable inferences in the light most favorable to the plaintiff. *Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992).

Kenneth R. Payne founded Heartland Financial Services, Inc., in January 1991 and served as its president. From 1994 to as late as August 2001, Heartland, together with JMS Investment Group, LLC, which was founded in 1997, and other affiliated companies, engaged in a massive fraud, holding themselves out as brokerage, insurance and estate planning firms and raising millions of dollars through fraudulent sales of securities. Working with Payne in this business were Daniel Danker, Heartland's vice president and office manager, Johann M. Smith, founder, manager and attorney for JMS, and Constance Brooks-Kiefer, an administrative assistant who worked for both JMS and Heartland. Their operation was a classic Ponzi scheme. Investors were promised extraordinarily high rates of return, which in the beginning were realized, for the purpose of encouraging greater reinvestment. By 1998, Heartland had over 700 clients, who had invested $22.6 million with the company. Between December 1997 and December 1999, JMS raised $18.5 million from over 250 investors. Altogether, the two companies and their affiliates collected over $60 million. In reality, Heartland and its affiliates did not invest most of the funds at all, but Payne and his colleagues withdrew and spent the money for their own personal benefit.

Payne and Danker were, at various relevant times, licensed as registered securities representatives of five broker dealers, the defendants in this case—Jonathon Roberts Financial Group, Inc., Alliance Capital Management Corp., Andover Securities, Inc., FSC Securities Corporation and FFP Securities, Inc. According to the Complaint, these broker dealers, which were registered under Section 15 of the Securities and Exchange Act and with the National Association of Securities Dealers, had the ability and the duty to supervise and control, directly and indirectly, the activities of Payne and Danker, but failed to exercise proper supervision or to maintain proper control. The Complaint also alleges that Payne and Danker were employees and agents of these companies, and that they were able to perpetrate the Ponzi scheme in part because they were able to hold themselves out as licensed registered securities representatives of the broker dealers.

On August 10, 2000, the SEC moved for, and the district court granted, a temporary restraining order against Payne and Danker. As part of the proceedings, the district court removed Payne, Danker, Smith and Brooks-Kiefer from control of Heartland and JMS and appointed James A. Knauer as receiver for the two companies.[1] According to the court's order, Knauer's mandate is "to marshal, conserve, protect, hold funds, operate, and with the approval of the Court, dispose of any wasting assets, wherever those assets may be found, of Heartland" "for the benefit of the investors." Agreed Order at para. 1, *SEC v. Payne* (S.D. Ind. Aug. 21, 2000) (No. IP00-1265 C). A year later, Knauer brought this action against the five broker dealers, charging that they are liable to Heartland and JMS for a variety of torts based upon the broker dealers' relationship with Payne and Danker: Counts I and II alleged that the broker

---

[1] Payne has since been convicted of mail fraud and money laundering. Danker has been convicted of wire fraud and money laundering. Both are serving lengthy prison terms.

dealers are "controlling persons" liable for the wrongful conduct of Payne and Danker and for the sale of unregistered, nonexempt securities by Payne and Danker pursuant to the Securities and Exchange Act of 1934 and the Indiana Securities Act, Ind. Code § 23-2-1-1 et seq. Count III alleged that the broker dealers are directly liable for breach of fiduciary duty and fraud and vicariously liable for the fraudulent and wrongful conduct of Payne and Danker under the doctrine of respondeat superior. Count IV alleged damages under Indiana's crime victims statute, Ind. Code § 34-24-3-1, based on both direct and vicarious liability.[2] Count V alleged negligent supervision of the activities of Payne and Danker by the broker dealers.

The broker dealers moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). They argued that the receiver had no standing because he was improperly asserting claims of the investors, and not claims of the entities on

---

[2]   Ind. Code § 34-24-3-1. Damages in civil action

 If a person suffers a pecuniary loss as a result of a violation of [certain statutes], the person may bring a civil action against the person who caused the loss for the following:

    (1)   An amount not to exceed three (3) times the actual damages of the person suffering the loss.

    (2)   The costs of the action.

    (3)   A reasonable attorney's fee.

    . . .

 In *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633 (7th Cir. 1987), we held that Ind. Code § 34-24-3-1 and Ind. Code § 35-41-2-3(a) ("A corporation, limited liability company, partnership, or unincorporated association may be prosecuted for any offense; it may be convicted of an offense only if it is proved that the offense was committed by its agent acting within the scope of his authority.") combine to form a statutory version of respondeat superior, pursuant to which principals are liable for offenses committed by an agent acting within the scope of his authority.

whose behalf he was appointed. In the alternative, the defendants argued that the receiver's claims were barred by the equitable doctrine of *in pari delicto*, which prohibits a plaintiff from maintaining a claim if the plaintiff himself bears equal fault for the alleged injury, and that the complaint failed to state a claim upon which relief could be granted.

The district court dismissed Counts I and II, agreeing with the defendants that those claims belonged to the investors in Heartland and JMS, rather than to the Ponzi entities themselves. The receiver does not appeal the dismissal of those two counts. The district court concluded that the receiver did have standing to assert Counts III, IV and V, but nonetheless dismissed these counts under the doctrine of *in pari delicto*. The district court held that these claims were barred because the receiver had pleaded in his complaint, "[s]imply put, [that] Payne, Danker, Smith, and Brooks-Kiefer *were* Heartland and JMS," leading to the "inescapable conclusion that Heartland and JMS participated in the Ponzi scheme and knew of the conversion of Heartland and JMS funds by Payne, Danker and others." District Ct. Order at 18, 16 (emphasis added). The receiver appeals the dismissal of Counts III, IV and V.

## II.

We review a Fed. R. Civ. P. 12(b) dismissal de novo. *Dawson*, 977 F.2d at 372.

## A.

Before considering the district court's ground for dismissal, we need to clarify exactly what claims are before us. Perhaps in part because of the unusual nature of this case, the receiver filed not only one lengthy complaint but incorporated by reference large portions of two additional com-

plaints filed in other proceedings. Taken as a whole, this pleading provides a plethora of detail about the alleged misdeeds of Payne, Danker, Heartland, JMS and other individuals and entities involved in the Ponzi scheme. It is quite significant, however, that the receiver is not pursuing all claims that might have arisen from such a complex and prolonged species of fraudulent activities.

What claims is the receiver pursuing? For our purposes, it is useful to think of Ponzi schemes as being comprised of two phases. First, the schemer solicits and receives money for investment, guaranteeing high returns while doing little with the money to produce actual profits. While in this first stage, the schemer may generate some income for himself by charging a fee or paying himself a salary with the funds, this "sales" step is not the source of most of his Ponzi gains. After all, the Ponzi schemer is not content to enrich himself modestly by extracting fees or salaries from the funds he has solicited. Rather, the schemer realizes most of his gains by appropriating large sums of money from the solicited funds, the pace of the withdrawals accelerating as he is ready to disband the Ponzi entity and make off with its assets. This "embezzlement" step of the Ponzi scheme depletes the Ponzi entity of resources, which are diverted to the entity's principal, the schemer.[3]

The five counts of the instant Complaint can be mapped along the lines of the two Ponzi phases. Counts I and II of the Complaint involve the torts associated with illegal sales of securities, and were dismissed by the district court. While those dismissals were not appealed and are therefore not before us, we believe that the district court was probably correct in concluding that Knauer, as receiver for

---

[3] We do not intend to imply that the two steps or phases of the scheme occur at chronologically distinct points in the life of the Ponzi scheme. Rather, it is likely that both sales and embezzlements are occurring simultaneously. Some sales, however, must precede diversion of funds; hence our two-phase analysis.

Heartland and JMS, had no standing to pursue the Ponzi sales claims. As we see it, Ponzi entities themselves are not injured by the sales of securities. Even if Heartland and JMS were arguably being "misused" by Payne and Danker, this misuse, at the sales stage, resulted only in the fattening of the companies' coffers.[4] Any claim relating to the fraudulent sales rightfully belongs to the wronged investors, and can be made by them against any one of Payne, Danker, Heartland, JMS or other culpable person or entity, including possibly the defendants here.

Somewhat different rules are in effect for Counts III, IV and V of the instant Complaint, which involve the embezzlement, rather than the sales, step of the Ponzi scheme. The receiver alleges "that injury to Heartland occurred when Payne and Danker misappropriated Heartland funds that had previously been paid to Heartland by investors." Receiver's Resp. to Mots. to Dismiss at 4, Record at 67. *See also* Sept. 4, 2002 Transcript at 43 ("[Judge Tinder]: So the harm to Heartland and JMS didn't come from the sales, it came from the embezzlement or taking of the funds by Payne and Danker? [Counsel for Knauer]: That is correct."). As the district court again properly concluded, the diversion of funds by Payne and Danker from Heartland and JMS did

---

[4]  We do recognize that Heartland and JMS were made vulnerable to liability as a result of their shareholders' misconduct. And in a different factual scenario, we might find such exposure to liability a sufficient injury to accord faultless representatives of a corporation, whether a receiver or subsequent innocent shareholders, standing to sue for the greater liability or deeper insolvency created by earlier shareholders. *See, e.g.*, *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001); *Miller v. San Sebastian Gold Mines*, 540 F.2d 807 (5th Cir. 1976). In a Ponzi scheme such as this one, however, where the Ponzi fraud pervaded the entire entity at all relevant times, we cannot find a justiciable injury. At least at the sales stage of the Ponzi scheme, every dollar tortiously produced was revenue to Heartland.

arguably constitute injuries to the Ponzi entities, giving Knauer standing to pursue Counts III, IV and V. But the next question is whether the equitable defense of *in pari delicto* defeats these claims as asserted against the broker dealer defendants.

### B.

Counts III and IV allege damages based on the broker dealers' role in Payne's and Danker's embezzlements, both directly and vicariously under respondeat superior, while Count V alleges that negligent supervision of Payne and Danker by the broker dealers contributed to the embezzlements. The district court dismissed Counts III, IV and V by applying the doctrine of *in pari delicto*. According to the receiver, *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), demands a contrary outcome. It is worth describing *Scholes* in some detail.

In *Scholes*, we had before us another Ponzi scheme, this one perpetrated by a Michael Douglas and his three corporations. Douglas's corporations formed limited partnerships, into which investors were duped into entering as limited partners. After Douglas and his operation were derailed by the SEC, the district court appointed a receiver, Steven Scholes, for Douglas and the corporations. By the time *Scholes v. Lehmann* came before us, Scholes had successfully recovered $12 million, most of it from property in the possession of Douglas that Douglas had bought with money siphoned from the corporations. In *Scholes v. Lehmann*, Scholes sought to reach and recover additional funds, from certain beneficiaries of Douglas's largesse—his ex-wife, an investor who had managed to profit from the Ponzi scheme and five religious organizations—under an Illinois fraudulent conveyance statute.

We rejected two arguments raised by the *Scholes* defendants. First, they disputed standing. *See Scholes*, 56 F.3d at

754 ("How, the defendants ask rhetorically, could the allegedly fraudulent conveyances have hurt Douglas, who engineered them, or the corporations that he had created, that he totally controlled and probably . . . owned all the common stock of, and that were merely the instruments through which he operated the Ponzi scheme?"). We found that there was standing because Scholes was proceeding not only on behalf of Douglas, but on behalf of corporate entities. The corporations, as legally distinct persons, were harmed by Douglas's fraudulent conveyances. *Id.* ("The corporations, Douglas's robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties. "). As long as an entity is legally distinct from the person who diverted funds from the entity, a receiver for the entity has standing to recover the removed funds. *Cf. Troelstrup v. Index Futures Group*, 130 F.3d 1274 (7th Cir. 1997) (distinguishing *Scholes* and finding no justiciable injury when a perpetrator of a fraud removes money from his own personal account rather than from an account in the name of a legally distinct corporation). The diversion of assets is a legally cognizable injury even if "[a]s sole shareholder, [the Ponzi perpetrator] could lawfully have ratified the diversion of corporate assets to noncorporate purposes." *Scholes*, 56 F.3d at 754.

The *Scholes* court also considered the applicability of the defense of *in pari delicto*. More precisely, the *Scholes* defendants had argued "that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors," *Scholes*, 56 F.3d at 754. In other words, Douglas had made the fraudulent conveyances to achieve an improper end (i.e., to put money beyond the reach of creditors), and should not be allowed to undo them to secure a benefit for himself. We rejected this argument as well, because Douglas himself did not stand to benefit from the receiver's suit—he was incarcerated and totally removed from association with the cor-

porations—and "the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated." *Id.* "The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys . . . that Douglas had made the corporations divert to unauthorized purposes." *Id.*

While *Scholes* may recommend a generous approach toward certain lawsuits brought by corporate receivers, even where the corporations they represent have been complicit in illegal activities, both parties here acknowledge that we must look to Indiana law to determine the rights of the receiver in the present case. *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83, 88 (1994). While no Indiana cases have addressed this precise situation, we find that related cases help provide context to *Scholes*.

"Since the rights and powers of a receiver with respect to the property in his hands as such are not specifically declared by statute the rules governing such rights and powers are of equitable origin. . . . The appointment of a receiver does not determine, or even affect the rights of the parties, except so far as it preserves and retains control of the property to answer final judgment." 24 Indiana Law Encyclopedia *Receivers* § 41 (citations omitted). "There can be no doubt of the proposition that it is the general rule that in the ordinary receivership, . . . the receiver can only sue in the right of the corporation, and that he is subject to all of the equities which would have been available against it." *Marion Trust Co. v. Blish*, 84 N.E. 814, 816 (Ind. 1908). "[T]he receiver of a corporation is bound precisely as it is bound and occupies the relation to the stockholders that the corporation itself, if waging the suit in its own person, would occupy. This is true, although the receiver represents the creditors as well as the stockholders." *Id.* at 817 (internal quotation marks and citation omitted).

The rule that a receiver stands precisely in the shoes of the corporation is, however, "subject to the exception that

the receiver so far represents the general creditors that he may avoid transactions in fraud of their rights." *Id.* at 816. This exception allows receivers to avoid transactions that violate the rights of creditors. *See Hammond v. Cline*, 84 N.E. 827, 828 (Ind. 1908) ("He takes over nothing but what belongs to the corporation, except, in certain cases, where the corporation is estopped by its fraud, he takes the right to prosecute an action for an avoidance of the transaction for the use of the general creditors."); *Franklin Nat. Bank v. Whitehead*, 49 N.E. 827 (Ind. 1908); *see also* 7 Indiana Law Encyclopedia *Corporations* § 181 ("While generally he or she is in no better position to bring an action than the corporation would have been, he or she may sue or defend in some circumstances where the corporation might have been estopped by its own fraud." (citations omitted)). *Scholes*, which was decided under Illinois law, is an example of the application of such an exception.

The principal issue is whether we find more appropriate here the general Indiana rule or the exception to that rule. If the case before us involved the voiding of a fraudulent conveyance, as in *Scholes* or the Indiana cases just cited, we would likely apply *Scholes* and the Indiana law favoring exceptional treatment of receivers in those circumstances. This case, however, presents a different equitable alignment. The key difference, for purposes of equity, between fraudulent conveyance cases such as *Scholes* and the instant case is the identities of the defendants. The receiver here is not seeking to recover the diverted funds from the beneficiaries of the diversions (e.g., the recipients of Douglas's transfers in *Scholes*). Rather, this is a claim for tort damages from entities that derived no benefit from the embezzlements, but that were allegedly partly to blame for their occurrence. In the equitable balancing before us, we find *Scholes* less pertinent than the general Indiana rule that the receiver stands precisely in the shoes of the corporations for which he has been appointed.

"The doctrine known by the latin phrase *in pari delicto* literally means 'of equal fault.' " *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. App. 1975) (quoting *Perma Life Mufflers, Inc. v. Intern. Parts Corp.*, 392 U.S. 134, 135 (1968)). "The expression 'in pari delicto' is a portion of the longer Latin sentence, 'In pari delicto potior est conditio defendantis,' which means that where the wrong of both parties is equal, the position of the defendant is the stronger." *Id.* (quoting W. M. Moldoff, Annotation, *Purchaser's Right To Set Up Invalidity of Contract Because of Violation of State Securities Regulation as Affected by Doctrines of Estoppel or Pari Delicto*, 84 A.L.R.2d 479, 491). "Equity looks beneath rigid rules to find substantial justice and has the power to prevent strict rules from working an injustice." 12 Indiana Law Encyclopedia *Equity* § 3.

Counts III and IV allege, essentially, that the relationship between Payne and Danker and the defendants results in liability for the defendants. Count V alleges that the defendants were responsible for supervising Payne and Danker, but failed in this responsibility. In sum, all of the liability, according to the complaint, arises from the employment or agency relationship between the broker dealer defendants and Payne and Danker.[5] In addition to

---

[5] The relationship between the primary wrongdoers and the defendants in this case resembles *Troelstrup v. Index Futures Group*, 130 F.3d 1274 (7th Cir. 1997). In *Troelstrup*, a receiver sued a futures commission merchant through which the principal tortfeasor had traded and maintained accounts. Similarly, the present case is against broker dealers who had an otherwise non-Ponzi-related relationship with Payne and Danker yet may have acted as intermediaries in some of Payne's and Danker's Ponzi-related securities transactions. While we did not reach the *in pari delicto* question in *Troelstrup*, and the opinion in that case distinguished *Troelstrup* from *Scholes* principally on the ground that *Troelstrup* did not involve a corporate receiver, we find instructive the fact that the receiver in *Troelstrup* was not seeking to avoid a fraudu-

(continued...)

the defendant broker dealers, however, there were other companies that had employment and agency relationships with Payne and Danker—namely, Heartland and JMS.

We find that Heartland and JMS are charged with fault at least equal to that of the broker dealers. Heartland and JMS were very much at the forefront of the Ponzi scheme. However, even if we could imagine that the broker dealers' relationship with Payne and Danker aided the solicitation of investments—and find plausible a suit by the defrauded investors against the broker dealers on this basis—the instant Complaint makes clear that the defendants' involvement in the Ponzi scheme as a whole was quite minor. *See* Compl. at 9, para. 44 (alleging that Payne's and Danker's sales activities "were not approved or authorized by the brokerage firms"). Of course, there is no allegation whatsoever that the defendants were directly involved in the embezzlements or benefitted from them.

The basic equity is that a broker dealer, which apparently had little to do even with the Ponzi scheme, should not be liable to Heartland, which was deeply complicit in the crimes, when both were employers and principals of Payne and Danker. Payne and Danker were, while conducting either the fraudulent sales or the embezzlements, more closely associated with Heartland and JMS than with the broker dealers. While, of course, the embezzlements did not benefit Heartland and JMS—as we have stated, the receiver here has standing because the Ponzi corporations suffered a legal injury from the embezzlements—the embezzlements did not benefit the broker dealers, either. We do not see how the embezzlements could be said to have

---

(...continued)

lent transaction, but was pursuing a tort action similar to the one here. As we will indicate, cases such as this one and *Troelstrup* present the receiver in a somewhat different position than cases such as *Scholes*.

arisen from Payne's and Danker's relationship with the broker dealers in a more cognizable way than from Payne's and Danker's relationship to the Ponzi entities, so that the brokers dealers could become liable to the Ponzi entities.[6]

The receiver's core argument is that Heartland and JMS should be allowed to pursue claims against the broker dealers because, as a receiver, he is somehow separated from the past crimes of Payne, Danker, Heartland and JMS. While that may be true, the extent of the separation, for purposes of applying standing and *in pari delicto* principles, is an equitable determination. Given the facts here, we do not see how the fact that Heartland and JMS are represented by a receiver should alone force us to ignore the fact that their nexus to Payne and Danker was far more immediate than that of the broker dealers, and deprive the broker dealers of the defense of *in pari delicto*. The doctrine of *in pari delicto* thus applies to defeat the receiver's claims.

## III.

For the reasons given above, the judgment of the district court is AFFIRMED.

---

[6] Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case. We are sensitive, as the district court was, that *in pari delicto* is an affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal. We find it appropriate here, however, given the facts thoroughly alleged in the complaint.

A true Copy:

Teste:

_____
***Clerk of the United States Court of
Appeals for the Seventh Circuit***